THORNE, NEALE & CO., Inc., v. READING CO.

BOUCHARD TRANSP. CO. v. SAME.

Nos. 188, 189.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1937.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney and Gerald J. McKernan, both of New York City, of counsel), for appellant. .

Purdy & Purdy, of New York City (Frank C. Mason, of New York City, of counsel), for appellee Bouchard Transportation Co.

Earl Appleman, of New York City, for appellee Thorne, Neale & Co.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

## L. HAND, Circuit Judge.

These appeals are from two interlocutory decrees in the admiralty holding liable the respondent, Reading Company, for damage to a barge and cargo while in a slip at Port Reading, New Jersey, on July 22, 1933. The respondent had brought coal to Port Reading consigned to the libellant, Thorne, Neale & Co., who had engaged the Bouchard Company, owner of the barge, "Dorothy," to carry it to New York. Bouchard delivered the barge to the respondent in New York which towed her to Port Reading and put her under the chutes. While there she developed a leak which eventually caused her to sink, the damage sued for. The testimony as to what happened comes for the most part from the mouths of three witnesses, Lufbarry, the respondent's loading foreman, Burton, the bargee of the "Dorothy," and Coll, the respondent's general foreman. Lufbarry's story was that while the barge was being loaded he noticed that she was aleak, and called it to the attention of Burton, telling him that the total load would be over a thousand tons. Burton told him to continue. However, after eight hundred had been put on, Lufbarry saw that she was leaking worse, and he then spoke to Coll, the general foreman. (Coll said that he called up the respondent's New York office and told them to talk to the owner.) A little while after Lufbarry had spoken to Coll, his telephone rang and a woman asked for Burton, who went to the telephone. The upshot of Burton's talk, as Lufbarry heard it, was that as instructed he would get a pump and tell the foreman to complete the load. He then turned to Lufbarry and did tell him to load, and Lufbarry complied. Burton's version differs somewhat in detail, but the substance of it was that a Miss Mitchell of the Bouchard office told him to get another pump from the barge, "Walters," nearby, and to take on the whole tonnage. After Lufbarry had put on 1061 tons, the tug, "Patience," pushed the "Dorothy" across the slip towards the opposite pier; but being unable to get her alongside, she left her with her right bow about five feet away from the pier side and her right quarter, fifteen feet. This was about noon. Burton, finding his boat still leaking, kept his pump going, but, as he was running out of gas, went ashore for more. Instead of going to a nearby station, he went several miles inshore, so that he did not come back until about three o'clock. Meanwhile the pump had been kept going by some other bargees from nearby boats, but the water had gained upon it. Shortly after Burton's return a second pump was brought from the "Walters," and started; but both together were not enough, and at about seven o'clock the

barge sank and slid off into deep water on the shelving bottom.

Coll and Grimes, the respondent's shore captain, had come alongside while Burton was away and examined the barge; they swore that they did not think she was then in danger. On the other hand Burton said that when on his return he had suggested to Coll to put her on the mud, he was answered that he was too busy with other boats; and Leland, another bargee, said that when he went to Coll to move the pump from the "Walters," Coll told him that he thought he could save the barge if he had time. Finally an apparently impartial witness swore that Grimes had said in his presence that he had seen four feet of water in her before she sank. Although the Bouchard Company did not call anyone to contradict the version of Burton and Lufbarry, the judge disbelieved both, and exonerated the libellant. He held the respondent for failing to beach the barge after they knew of her condition, but found that the tug had not broken any of her planks, as charged, when she pushed her up towards the pier. Thus, interlocutory decrees in personam issued against the respondent upon both libels, but the suits against the tug were dismissed.

■ We seldom disturb a finding of the district court, as we have said again and again, but we have a final responsibility for the facts as well as for the law, and the finding at bar should not stand that the Bouchard company did not know that the tug was leaking and through Burton did not direct Lufbarry to continue loading. Burton may have been an untrustworthy witness, but there was no reason to suspect Lufbarry except for his probable desire to exculpate himself; and both witnesses were corroborated by Coll, the general foreman, who said that after Lufbarry's talk with him he called up the New York office. No doubt we should not have been justified in overruling the finding, had the Bouchard company contradicted it; but they neither produced the supposititious Miss Mitchell to contradict Burton, nor did they account for her absence. Although Burton was called after the close of the case, Lufbarry had been examined before, and had advised the libellant of what the position would be. Testimony left thus unanswered without excuse, we cannot disregard and must conclude that someone in the Bouchard office had directed the loading to go on. This charges that

company with fault, either for the full loading, or for Burton's failure to get the second pump in time.

■ The respondent was also at fault. Perhaps it was wrong to leave the barge at the pier at all; she was known to be a leak and it was a bad place if she sank. But since we are holding that the respondent had been assured that the leak could be controlled, we will not charge it for leaving her where she would have been safe, if she had been properly pumped. But when Coll and Grimes went to look at her, just before Burton returned, it could only have been because they were uneasy about her safety. Grimes went aboard and if he did not see that she had four or more feet of water in her, he should have done so, because that was the case. True, they said that they thought she was then apparently not in danger, but—quite apart from the contradiction of this by three witnesses—if one pump had failed to hold down the water, they should not have assumed that two would necessarily be enough. She did not sink until four hours later, and during all that time they entirely neglected her. If she was too fast aground to move, as they say, they could have pumped her out with a tug's siphon, and then pushed her ashore on an even bottom. To leave her partially aground, liable to strains and to slide off as she did, was to court catastrophe. Unless the respondent was exempt of all duty of care, it too was chargeable with the result.

The respondent relies upon Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, to absolve it from any such duty. That case did authoritatively settle it that a tug is not the bailee of its tow, and it was necessary to decide the point, because if so, the libellant had not made out a prima facie case. He had relied upon the presumption of fault arising in cases of bailment from a return in bad condition of the bailed property. That was all that the case decided; the court was not concerned with the duties of the tug arising out of the contract of towage, and certainly did not mean to change the law about them. It is quite true that in holding a tug for failure to protect the tow, we have at times spoken of the situation as one of bailment; that was indeed the cause of the doubts that were laid by Stevens v. White City, supra; and the temptation is strong where the contract involves towing a barge, holding her at the tower's con-

venience, lading her and towing her back. (Ordinarily it is true, a barge is held only until the railroad can make up a flotilla for New York; in this case she was to await the order of Thorne, Neale & Co.; but the difference is not material.) However, in the first case in this circuit, The William Guinan Howard, 252 F. 85, although the railroad was held under its contract for putting the barge in a dangerous place, we did not suggest that there was a bailment, except in so far as the language of Hough, J., who dissented, may be thought to have imputed such a meaning to the majority. But when the same situation next arose, in Doherty v. Pennsylvania R. Co., 269 F. 959, we did say that the relation was a bailment, citing some early cases which quite unnecessarily used that word to describe the relation, and we have repeated it several times since. Harris v. Port Reading R. Co. (C.C.A.) 45 F.(2d) 160; Du Bois Sons Co. v. Pennsylvania Railroad Co. (C.C.A.) 47 F.(2d) 172, 174; In re Pennsylvania Railroad Co. (C.C.A.) 48 F.(2d) 559, 562. Perhaps it is not unnatural therefore that the opinion should apparently have become current that the basis of the tower's duty to care for the tow is a bailment, and that if there be no bailment, there will be no duty. Nevertheless, there is no reason for connecting the two, and their confusion illustrates the danger of the loose use of legal terms. Barges taken on such a contract are not in bail to the railroad, which has as little possession of them as of any other tow; the situation is not an exception to the general doctrine. The source of the railroad's duties is the contract by which it engages to take the vessels, lade them and bring them back; and the question is of the reasonable implications of that undertaking. While the boats are in the Kills, awaiting their turn at the chutes or the make-up of loaded flotilla, the owners cannot take care of them by any reasonable effort, and the railroads can. The bargees are helpless except to tend the lines, to pump, and do such other matters as are within the powers of a single man; they cannot select their berths, or put them ashore in an emergency. This is understood by both parties and enters into their mutual engagement. It would for this reason be unreasonable to expect the necessary care from the owner, who is distant from the scene and whose individual efforts would almost certainly interfere with the railroad's arrangements anyway. Having

by implication the power to suit their convenience in loading and returning the boats, the roads are under the correlative duty to mind them while they are there, and the period of that duty may be extended if the road agrees, that they shall not be put into a flotilla till the owner gives the words; though it is really not necessary to hold the last in this case, because, so far as appears, the "Dorothy" sank before she could have been put in a tow. All this is old law and Stevens v. White City, supra, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, did not touch it.

Decree in Bouchard v. Reading Co. modified to hold both parties at fault and to divide the damages.

Decree in Thorne, Neale & Co. v. Reading Co., affirmed.