108

**Harold L. VALENTINE, owner of the Barge Rose T., Libellant,**

v.

**PENNSYLVANIA RAILROAD COMPANY, Respondent.**

No. 15208.

United States District Court
E. D. New York.
March 21, 1938.

Purdy, Mason & Lamb, by Edmund F. Lamb, New York City, of counsel, for libellant.

Burlingham, Veeder, Clark & Hupper, New York City, by Chauncy I. Clark, Frederic Conger, New York City, of counsel, for respondent.

INCH, District Judge.

Apparently this is but one of several admiralty suits arising from a storm which took place during February 21, and February 22, 1937, at Greenville, New Jersey, causing damage to certain so-called "market boats".

By a market boat is meant "a boat that is loaded with coal at South Amboy, with no destination or consignee". Such boats are loaded with coal so as to release the railroad cars, but, as the coal has not at that time been sold to a consumer, the boat is put up either at Communipaw or Greenville as a convenience to either the shipper or consignee and there awaits a sale. The barges sometimes wait at Greenville for a customer as long as "five or six months". No extra charge for this convenience is made.

Libellant is the owner of the barge Rose T., which sank, in the early morning of February 22, 1937, in the slip between the covered pier and the long dock at Greenville, New Jersey, on the south side of the long dock up near the bulkhead.

When her load of coal was taken off and she was raised and examined she was found to have sustained, from some

cause, certain damage on her starboard corner stern and at the bow.

An expert witness testified that, in his opinion, this damage at the stern had been caused, "by some object contacting that corner while in motion".

Libellant has sued the respondent on the theory that the respondent is liable for such damage and loss because the facts and the law placed upon it a continuous obligation of care for this barge and that it failed to give proper and adequate protection to her.

Another reason given for this liability arises from an alleged collision between one of respondent's lighters which had been moored on the south side of the long dock and which broke adrift in the same storm, as to which libellant claims no adequate explanation has been made by respondent.

The respondent disclaims any liability, denies that there was any collision and asserts that the Rose T., sank because of the negligence of her captain and in spite of the exercise of any care imposed on respondent.

As in many admiralty suits the first task is to ascertain the true facts. With these ascertained the application of the law presents less difficulty.

Possibly the first of such suits tried is that of Burns Brothers against the Pennsylvania Railroad Company, tried before Judge Campbell on or about January 6, 1938 (not reported. Eastern District, Admiralty 15175), whose opinion sufficiently indicates to me what the law also should be in this suit before me. Not only are the facts substantially the same, but I agree with Judge Campbell, that there is a different responsibility resting on respondent at Greenville from that during the loading and towage.

Moreover, unless plainly necessary, it is important that as to an occurrence such as we have here, there should be no disagreement as to the law applicable between judges of the same district.

Accordingly, I find that there were two separate contracts. The first was made in New York by Peterson, representing Burns Brothers, with Crowley, the tug dispatcher of the respondent. This was "in the afternoon of February 10, 1937." This contract covered a tow of the barge Rose T., from New York to South Amboy. It terminated when the Rose T., was left properly moored at the stakes at South Amboy, February 11, 1937.

Thereafter a second contract was made by the Steamship Fuel Corporation which embraced taking the barge from the stakes at South Amboy to the loading pier and after loading, towage to either Communipaw or Greenville, pursuant to the general procedure in effect as to such market boat.

As the Rose T., was a Burns Brothers' chartered boat such procedure indicated Greenville as the convenient waiting place for such chartered boat.

■ Therefore, as Judge Campbell held, in the Burns Brothers' case, and as I likewise find in this case, libellant cannot recover by merely showing that the Rose T., was in good condition, as she undoubtedly was, before the towing from New York started and that she was damaged by the storm in Greenville. The proof here, as in the Burns case, shows that when she arrived at Greenville she was placed in a usual and reasonably safe berth, her captain was on board, she was properly moored with many other boats of the same class, the weather was fair, with no indication of storm.

The Rose T., was not damaged during the towing of the boat to South Amboy or while taking on coal or while being towed to Greenville. There was no direction to take this chartered market boat to Communipaw.

During the time therefore, that the Rose T., was at Greenville she lay there with the express permission of the respondent and with the knowledge and approval of all parties interested and without extra charge.

■ The use of the respondent's property at Greenville however, included the use, for sometimes extended periods,

of the piers and slip, the mooring and the departure of numerous market boats, in this instance some 46 in number, and therefore, in my opinion, the Rose T., was not a mere "licensee" limiting the liability of respondent to wilful acts and active negligence. Larmore v. Crown Point Iron Company, 101 N.Y. 391–395, 4 N.E. 752.

There was plainly a mutual advantage in this arrangement of temporary location not necessarily financial in its nature, but helpful or at least useful in respondent's business. Bennett v. Louisville & N. Railroad Company, 102 U.S. 577–585, 26 L.Ed. 235; Northern Pac. Ry. Co. v. Curtz, 9 Cir., 196 F. 367, 45 C.J. 221, page 813. See also 65 C.J.S., Negligence, § 43(3). The Rose T., was what has been termed a "licensee with an interest" or better an "invitee". This placed upon the respondent the duty of using ordinary care.

"It was, therefore, the plain duty of the company to take such precautions, from time to time, as ordinary care and prudence would suggest to be necessary for the safety of those who had occasion to use the premises for the purposes for which they had been appropriated by the company, and for which, with its knowledge and permission it was commonly used by the public", or, in this case by the owners of these market boats. Bennett v. Railroad Company, supra.

Respondent was not required to assume that the owner of the barge and her captain would not be reasonably experienced and equally careful for the safety of their boat.

What was ordinary care required would depend upon all the circumstances.

A brief statement of these circumstances should be made.

The slip at Greenville is 270 feet wide, with piers on each side, one a covered pier, the other an open one. There were a large number of other barges tied up in this slip. There is no dispute that when the storm began on Sunday, February 21, the wind, about one o'clock in the afternoon, changed to southeast with an average velocity, approximately of 20 miles an hour. That this wind was coming in at an angle of about 45 degrees towards the south side of the open pier.

The Rose T., had arrived at her berth on February 13th. This berth had been the first tier from the harbor on the north side of the covered pier. On Saturday, February 20, Larsen, her captain, shifted her from the first tier to the fourth boat in the second tier. At that time the Rose T., was a "little down" at the stern, but he tied her up and asked some of the other captains to look after her and then departed not to return until Tuesday, February 23rd.

It appears that these captains shifted their boats around as they thought best, but unfortunately for Larsen when he shifted the Rose T., he left her stern towards the harbor and her pump was at the stern.

The Rose T., was loaded with about 773 tons of coal and, as there were not four barges in the first tier, the full force of the southeast wind and sea would be on her stern.

This wind and storm gradually increased during the afternoon of Sunday until, in the early morning of February 22, it reached a velocity of 43 miles and possibly greater. This had whipped-up a heavy sea to which the stern of the Rose T., already somewhat low, received the full force.

One of the captains of a nearby barge did go on the Rose T., and pumped her Sunday morning, but the last time that he did this was about three o'clock Sunday afternoon before the storm had reached really dangerous proportions. No one else appears to have looked after this barge.

It certainly was not a duty of respondent to forbid the captain of the Rose T., to leave his boat or to move her in a safer manner; it could properly expect the captain of the Rose T., to use reasonable care to protect his barge. Instead of this Larsen was plainly negligent. He must have known, as he was

not far away, at Fort Hamilton, Brooklyn, that the weather had changed on Sunday afternoon for the storm was present at both places. His excuse that he was inside his father's house is insufficient when the duty resting upon him is considered. In the exercise of due care he should have returned to his barge and he had no right to rely on other captains performing his duty for him.

If Larsen had been present he could have secured aid from these captains or at least attempted to do so and shifted the stern of the Rose T., around so that he would have been able to use his pump or he could have notified the respondent that his barge should be shifted. The evidence shows that such aid would have been available. Instead of doing anyone of these things his absence left the Rose T., without this necessary care. The M. M. O'Brien, D.C., 60 F.2d 976; The Delaware & L. W. No. 442 (The Pennsylvania R. R. No. 437) 2 Cir., 30 F.2d 250; The Junior, 2 Cir., 279 F. 407; The Dunnigan Sisters, D.C., 53 F.2d 502.

As the storm increased the seas became increasingly heavy and fell deep upon the stern of the Rose T., putting her pump out of commission and making a dangerous situation.

Finally someone did notify the employees of the respondent that boats were in difficulty at the covered pier and respondent's tug Alliance promptly answered the call. She found that the waves were breaking heavily on the stern of the Rose T. They found nobody on board and some of her lines had to be cut so that she could be taken up the slip. She was taken up the slip towards the bulkhead where she could be syphoned and, in fact as they were about to syphon her, she sank.

I agree with Judge Campbell in the Burns case that the fact storm warnings had been given that Sunday morning and were known to respondent, did not require the respondent to notify the captains of the various scows nor would it have been of any avail here because the Rose T., had no captain present.

The respondent, in the exercise of ordinary care, was not required to see whether there was a captain on board or not. The most that could be required of respondent in the absence of knowledge of such distress would be to render reasonable assistance when requested. This it did, but because of the absence of her captain this request for assistance was not given in time. One of the floatmen of the Alliance testified, "the (her) condition should have been reported an hour or two before".

Looking backward it might seem that possibly it would have been well for respondent's employees to have arrived earlier in view of the extent of the storm, but this view is caused by what occurred. The reasonable view as to respondent's duty is what was the situation at the time? Here was a strong southeast wind and heavy seas. It naturally would be expected that captains of barges if in serious trouble would promptly endeavor not only themselves to protect the barge, but also seek immediate assistance if their efforts were unavailing, yet nothing of the kind occurred. I do not think that it can be said to be careless on the part of respondent in waiting for notice of a dangerous condition especially where the captain of the Rose T., which was the boat requiring assistance, had carelessly left her to the care of whatever captain had the time or inclination to look after her in addition to his own boat.

In such circumstances I am not inclined to search for any such alleged lack of care on the part of respondent. The City of New York, 147 U.S. 72–85, 13 S.Ct. 211, 37 L.Ed. 84.

If this were all there was to this case it would be on all fours with the Burns case where Judge Campbell dismissed the libel.

However, libellant claims, and produces two alleged eye witnesses, that respondent's Lighter 270, which had been properly moored 500 feet in from the end of the open pier which pier was opposite the covered pier at which the Rose T., was lying, broke away and in

drifting up the slip collided with the Rose T., damaging her stern corner rail and top log apparently above the water line. Libellant claims the Rose T., was thus caused to eventually sink.

I do not find it necessary to discuss the question of care on the part of the respondent in this regard for the reason that I am convinced that no such collision took place.

The testimony of these witnesses produced by libellant does not appeal to me as being true, especially is this so when all the circumstances are considered. The slip was 270 feet wide and the fact that this alleged collision was at about the height of the storm, with wind blowing from southeast at an angle of about 45 degrees towards the open pier opposite the Rose T., it seems to me highly improbable that this lighter which was light, with its free-board of about 6 feet aft and 10 feet forward and with its house, would drift against a 40 mile gale to cross this slip as it would have to do to come in contact with the Rose T.

Witnesses for respondent testified to the course that this lighter took, and saw her pass on the north side of the slip where she would be expected to be with the wind blowing as it was.

Moreover, when the testimony of these eye witnesses of libellant is carefully considered, many discrepancies appear. For instance one testified that he saw the 270 break away at the bow and hang on her stern and then swing in to collide with the Rose T. But there is no dispute that this lighter was moored stern out and it is incredible that she would break away at the bow while her stern hung to the pier. Also it appeared that one of the witnesses who said he had made a diagram of what occurred at the time for himself had really made this diagram, long after, in the lawyer's office. Neither of the witnesses seemed to think the matter of any importance and made no report, so far as the record shows, to anyone or to Larsen upon his return.

Finally it must be remembered that the rain and the wind and the waves were making it very necessary for each captain to look after his own boat and when not doing so to seek the protection of his cabin. Thus one of these witnesses at first indicated he saw the contact while pumping, but in the next breath said he saw it through the window of his cabin.

Libellant produced a so-called expert and in answer to a hypothetical question this witness made quite a little about a wind eddy off the open pier and the capricious nature of a lighter. I prefer to stick to the probabilities which seem to me to be that a boat of the character of Lighter 270 in the grip of a 45 mile gale does not go up into that gale, but goes along with it. The Black Diamond, 2 Cir., 273 F. 811. The Lexington, 2 Cir., 266 F. 353. The Cedarhurst, 2 Cir., 42 F.2d 139.

While it is not shown just how the damage to the stern corner rail and top log and bow of the Rose T., was caused, it is argued by counsel for respondent that this possibly may have occurred when the barge was subsequently raised and her cargo taken from her and in any event did not contribute to her sinking.

There is some evidence to sustain this view for when the Rose T., was taken in tow by the tug Alliance, Captain Malcolm said he saw no such damage. Stiles, the mate of the Alliance, was asked these questions: "Q. Did you observe when you were on the Rose T., any damage on her anywhere? A. None at all. Q. And you were on her bow and stern? A. Yes sir".

Ray, floatman on the Alliance testified that he wasn't on the stern of the Rose T., until, "we got her up the slip". He was then asked this question: "Q. Did you see any damage on her anywhere? A. No sir".

In substance, therefore, we have a barge that was negligently left by her captain at a time when he could and should have been present and respondent did all that ordinary care on its part required to be done in the circumstances.

I do not think, as claimed by libellant, that the case of The Helderberg (Mackay v. Pennsylvania R. R. Co.) 2 Cir., 94 F.2d 649, in effect overrules the decision of Judge Campbell in Burns Bros., v. Pennsylvania R. R. Co., above mentioned.

Furthermore, the facts in that case are materially different. Judge Campbell held that "in order to recover, the libellant was bound to show negligence on the part of the respondent".

The libel should be dismissed with costs.

If this opinion is not considered sufficient compliance with the Rule 46½ of the Rules in Admiralty, 28 U.S.C.A., findings of fact and conclusions of law in accordance herewith may be submitted.