**DALY v. READING CO.**
**THE DALY NO. 32.**
No. 18517.

United States District Court
E. D. New York.
March 31, 1953.

Mahar & Mason, New York City, proctors for libelant; Frank C. Mason, New York City, advocate.

Macklin, Speer, Hanan & McKernan, New York City, proctors for respondent; Leo F. Hanan, New York City, advocate.

ABRUZZO, District Judge.

The barge Daly No. 32 owned by the libelant was damaged at Port Reading, New Jersey, on March 19, 1947. It was fully loaded with coal and was berthed at that port from March 14th to March 19th, during which time the barge grounded on several occasions and, on March 19th, was caused to sink. Hence, this suit for damages.

The libelant's claim in support of the libel alleges improper berthing on the part of the respondent which grounded the barge and caused her to sink. The respondent denies responsibility for any damage.

### Facts

The barge was hired by Sinram Bros., coal dealers, to carry a cargo of coal from Port Reading to some point in New York City. Directions or orders as to where this coal was to be delivered were to be given by Sinram Bros. After Sinram Bros. had hired the barge, the libelant called the respondent's dispatcher and reported it for towing to Port Reading and return. It was delivered light to the respondent in New York City and towed to Port Reading. Pursuant to arrangements by the libelant and respondent, the barge was towed for the account of Sinram Bros. and the bill was to be paid by Sinram Bros. Libelant gave no orders for loading or for the return of the barge. This was done by Sinram Bros.

The Daly No. 32 had an over-all length of 100 feet, beam 27 feet, and outside depth 12 feet, and had a maximum capacity of 600 tons. On March 15, 1947, it was loaded with 532 tons of buckwheat coal and then moved from the loading dock to the north side of the dumper dock by respondent's shifting tug, Ashburn, and placed alongside the barge McLain No. 231.

On March 15th The McLain No. 231 was taken away from the dock and put into a flotilla. After this movement, the captain of The Ashburn told the captain of The Daly No. 32 to run a line in to the dock, but the captain of The Daly No. 32 told the captain of The Ashburn that he did not want his barge berthed at the dock because the water there was "not satisfactory." Instead of doing what the captain of The Ashburn told him to do, he put a line out to the bow of the barge Delaware which was directly ahead of him, and made fast. He then went to the office of the respondent on the dock and

spoke to Coll, the night manager, and informed him that he did not want the 32 to be berthed at the dock because of the insufficiency of the water. Coll told him that he would try to have her tied up somewhere else, but on his return he found his barge had been berthed at the dock. On the following morning he spoke to Grausman, the day manager, repeating his complaint of unsatisfactory water. He was told by Grausman that there was plenty of water at the dock and that berthing at that point would be quite safe.

On March 15th, in spite of what Grausman told him, his barge went aground and listed, and he then found 13 or 14 inches of water in the stern, although the normal accumulation at this point was 4 inches. He took soundings with his pike pole to which he had attached a stick at right angles and found that he had plenty of water on the starboard side. On the port side from the stern to the port quarter cleat he could see and touch soft mud, and at the port bow end of the barge he found a hard bottom. This condition existed from the bow to the bow quarter cleat. He attempted to pump the water out of the barge but was unable to do so because coal was coming through the pump's diaphragm and portable clapper. At noon he telephoned libelant's brother, James, who later that day came to Port Reading with a portable pump.

On March 16th The Daly No. 32 again went aground at the port bow corner, but there was no sign of unusual water. When the tide ebbed, the barge was held fast against the dock, ofttimes with three or four other boats outside her, but when the tide was flooding it held the barge away from the dock. He kept his line slack, hoping that the boat would drop away from the dock.

On the night of Thursday, March 18th, he retired about 10 p.m. and awoke in the early morning of the 19th. The tide was rising and he noticed a bad list to the port side of the barge and water was over the port side of the deck. He started his pump and then went to respond-

ent's office and endeavored to get a tug to move the barge to a shallower spot, but was unable to obtain one. He borrowed a portable pump from another barge and returned to his barge but, by the time he returned, his barge had sunk. At this time he found that some of his lines were tight and one had broken.

During this period of four days he had not received any orders to move but that was not unusual. It was customary for a barge after it was loaded to stay berthed at Port Reading until it received orders to be returned. The captain of The McLain No. 231 partially corroborated the captain of The Daly No. 32.

James Daly, libelant's brother, who had been in the barge business for 31 years and was in charge of the general maintenance and supervised all repairs to The Daly boats, testified that the barge Daly No. 32 was in good condition and entirely seaworthy. He further testified that when he went to Port Reading he spoke to Grausman and asked him to move The Daly No. 32 and Grausman told him that he would take care of the matter.

Donovan, a marine surveyor, testified that he examined The Daly No. 32 in dry dock on March 28th and that in his opinion the repeated groundings at the port side forward had worked the seams open, permitting leakage, and when the barge lay on an even keel the seams would close up to some extent because of the buoyancy of the water.

Grausman, the general foreman of the respondent, and Coll, respondent's night manager, denied that they had received any complaints from either Daly or the captain of The Daly No. 32. Grausman did not remember how long prior to March 19th respondent took any soundings in the vicinity of the place where The Daly No. 32 was berthed. Coll corroborated the captain of the barge that a request was made for a tug boat at 3 o'clock on the morning of the 19th to syphon The Daly barge be-

cause it was sinking but he had no tug available.

Zarenda, the captain of respondent's tug Ashburn, denied the evidence given by The Daly barge captain, and testified that he received no complaint from The Daly captain. He testified that he never received any complaints of insufficient water at this point and no boat in his experience had grounded there; and that respondent was supposed to dredge at this dock due to the fact that about a month before the sinking he saw a surveyor and knew that after the respondent made soundings that it was going to dredge.

I find the libelant's facts in support of its claim for damages substantially true, and it is entitled to a decree.

The decisions as I read them hold that the respondent was charged with the responsibility of determining where the barge should be berthed, and the movement and placing of The Daly No. 32 while she was at Port Reading awaiting orders to move rested entirely upon the respondent. It further owed the libelant the duty of proving a reasonably safe berth which I find from the facts it did not do.

The law is well settled as to the liability of respondent under the arrangements in the instant case. In Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F. 2d 694, at page 697, the court said:

"The source of the railroad's duties is the contract by which it engages to take the vessels, lade them and bring them back; and the question is of the reasonable implications of that undertaking. While the boats are in the Kills, awaiting their turn at the chutes or the makeup of loaded flotilla, the owners cannot take care of them by any reasonable effort, and the railroads can. The barges are helpless except to tend the lines, to pump, and do such other matters as are within the powers of a single man; they cannot select their berths, or put them ashore in an emergency. This is understood by both parties and enters into their mutual engagement. It would for this reason be unreasonable to expect the necessary care from the owner, who is distant from the scene and whose individual efforts would almost certainly interfere with the railroad's arrangements anyway. Having by implication the power to suit their convenience in loading and returning the boats, the roads are under the correlative duty to mind them while they are there, and the period of that duty may be extended if the road agrees, that they shall not be put into a flotilla till the owner gives the word; * * *."

I find nothing in the evidence to substantiate the suggestion by the respondent that The Daly No. 32 was not entirely seaworthy. The accident and subsequent damage was caused entirely by the negligence of the respondent in not providing a safe and suitable berth for The Daly No. 32, and a decree in favor of the libelant is warranted.

Submit findings of fact, conclusions of law, and a decree in accordance with this opinion.