Edward **DALY**, as Owner of **THE DALY NO. 32**, and as bailee of the cargo of coal laden thereon, Libelant-Appellee,

v.

**READING COMPANY**, Respondent-Appellant.

No. 80, Docket 23184.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1955.

Decided March 15, 1955.

Macklin, Spear, Hanan & McKernan, New York City, Leo F. Hanan, New York City, of counsel, for respondent-appellant.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for libelant-appellee.

Before L. HAND and SWAN, Circuit Judges, and DIMOCK, District Judge.

DIMOCK, District Judge.

Sinram Brothers, coal dealers, "ordered" from Daly, libelant, his barge, Daly No. 32, to carry a cargo of coal from Port Reading on the Arthur Kill in New Jersey. Sinram was to pay Daly on a tonnage basis. Daly engaged respondent Reading Company to tow the barge light to Port Reading and laden away from Port Reading. Daly gave the orders for

the voyage to Port Reading and Sinram Brothers gave the orders for loading the barge and were to give the orders for her voyage from Port Reading.

On March 14, 1947, the barge was loaded with coal at Port Reading and was moved to a dock controlled by Reading Company to be held "in the market" while Sinram was finding a sale for the coal. The bargee says that he immediately protested that he did not want his barge berthed there because the water was not satisfactory.

The Daly 32 was moored outside of another barge, the McLain No. 231, about noon. Low water occurred at 7:55 P.M. Thereafter, at 9:50 P.M., according to the log of the Reading tug, the McLain was shifted out of the berth and the Daly 32 put in her place. The bargee pumped out the Daly 32 at about 10 o'clock, finding only about 4 inches of water in her and nothing wrong with the boat. The next morning, when he got up at about 7 o'clock, he found 13 or 14 inches of water although there had been no low tide since he had found her in good condition the night before. He had trouble with his pump and went ashore. He says that on that trip he again complained, this time to Reading's day manager, that there was not satisfactory water at the berth and he insists that he was told to go back because there was plenty of water there. At about 9:30 the bargee sounded with a pike pole and found that the barge was resting on a hard bottom at the port bow next to the dock.

In spite of the fact that there was water in the barge at 7 o'clock on the morning of March 15, she did not take in more than the normal seepage while she remained in the berth during the 15th, 16th, 17th and 18th of March even though, according to the testimony for the owner, she grounded at each low tide.

The bargee telephoned to one of the Daly family about 11 o'clock on the morning of March 15 that the pump would not work. Edward Daly, the owner of the barge, and his brother went down to Port Reading in an automobile with a portable pump which they put on the barge. The brother says that he went to the day manager for the Reading Company, with the barge captain, and told him that the barge "was not laying right" because she was going aground on "very [sic] low water." He says that he asked the manager to move the barge and was told that it would be taken care of.

The bargee saw the Reading manager daily thereafter on March 16, 17 and 18 and made no complaints.

At about 3 A.M. on March 19 the bargee awoke to find that his barge was leaking heavily, listing to port and toward the dock so badly that water was over the deck all along the port side. Low water had occurred at 11:50 P.M. The barge went down in about a half hour.

Both the night and day managers deny receiving any complaint about the berth.

There was sufficient evidence that the barge went aground on every low tide and that the sinking was due to the opening of her seams due to the strain. Reading's expert testified that a barge on a muddy bottom (evidently the hard bottom at the port bow was only a spot) would pick up mud in the openings in her seams and that the mud would, to some extent, act as caulking. It is possible that the mud on the first grounding caulked the seams which had let in the 13 or 14 inches of water the night before and that this mud caulking had kept the seams reasonably tight through all the period from March 15 to the night of March 18 but that the cumulative effect of the wrenching was such that, by that time, the seams had opened so far that mud would no longer serve as caulking.

■ Thus far the controversy has raged around the question whether the arrangement consisted of a single contract, to tow the barge to Port Reading and back, or two separate contracts, one for the voyage to Port Reading and the other for the voyage back. If a single

contract, the doctrine of Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694, would cast upon Reading the duty of "minding" the barge while she was at Port Reading. If two contracts, Valentine v. Pennsylvania Railroad Company, D.C.E.D.N.Y., 131 F.Supp. 108, 1938 A. M.C. 595, affirmed, 2 Cir., 101 F.2d 1011, would limit Reading's duty to due care.

The District Court resolved this controversy in favor of the single contract and therefore held that Reading was under an affirmative duty. 115 F.Supp. 694. We find it unnecessary to pass on the correctness of this proposition since we are satisfied that, even if Reading's obligation was limited to the exercise of due care, Reading was guilty of a breach of that obligation.

■■ While the loaded barge was at Port Reading, Reading's obligation was at least equivalent to that of a wharfinger. That obligation certainly extended to include the duty to use due care to furnish a fair berth. It is true that Daly did not prove that Reading knew or ought to have known that the berth was foul when Reading berthed the Daly 32 there. Reading's duty continued, however, as long as the Daly 32, with Reading's permission, remained at Reading's wharf. Thus, if and when Reading received notice that the berth was foul, it was Reading's duty to use due care either to make the berth fair or to remove the Daly 32. Perhaps, assuming as we are, that there was no general obligation to "mind" the vessel at the wharf, Reading could have fulfilled its obligation to the Daly 32 by a mere warning of the danger if the Daly 32 had been capable of independent locomotion. Here, however, the same conditions obtained in that respect as those presented in the Thorne, Neale case. There the court said, 87 F.2d at page 697, "While the boats are in the Kills, awaiting their turn at the chutes or the make-up of loaded flotilla, the owners cannot take care of them by any reasonable effort, and the railroads can. The bargees are helpless except to tend the lines, to pump, and do such other matters as are within the powers of a single man; they cannot select their berths, or put them ashore in an emergency."

■ We accept Judge Abruzzo's finding that Reading had notice of the danger in time to have moved the Daly 32 and that its failure to do so resulted in the sinking.

■ Reading contends that negligence of the bargee contributed to the loss in that he did not insist on removal to a safe berth. There is evidence that the barge owner's brother advised Reading of the first grounding and was told that the matter would be taken care of. A rule that required a mere bargee thereafter to hound the Reading Company would ignore the facts of life. Hastorf Contracting Co. v. Ocean Transportation Corp., D.C.S.D.N.Y., 4 F.Supp. 583.

■ Reading contends that the damage was due to unseaworthiness of the barge, shown by the leakage on the night of March 14, and unseaworthiness of the pump, shown by its inability to pump out the water before low tide on March 15. There is, however, no proof of causal connection between those circumstances and the final sinking. Even if they did cause the first grounding, the rest of the groundings had no connection with them. No doubt this barge, under the barge owner's theory that she sank as a result of the repeated strains, sank sooner than a tighter barge would have. That, however, does not mean that she was unseaworthy.

The interlocutory decree is affirmed.