411 F.Supp. 808 (1976)
PASCO MARKETING, INC., a corporation, Plaintiff,
v.
TAYLOR TOWING SERVICE, INC., a corporation and Security Barge Line, Inc., a corporation, Defendants.
No. S74-73C.
United States District Court, E. D. Missouri, Southeastern Division.
February 17, 1976.
*809 *810 Robert G. Brady, C. Perry Bascom, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
James E. Reeves, Ward & Reeves, Caruthersville, Mo., for defendant Taylor Towing Service, Inc.
Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., for defendant Security Barge Line, Inc.

MEMORANDUM OPINION
HARPER, District Judge.
Plaintiff, Pasco Marketing, Inc. (hereinafter referred to as Pasco) brought suit in admiralty claiming damages caused to its docking and mooring facility near New Madrid, Missouri, on January 29, 1973, plus interest from the date of the filing of the complaint. On January 29, 1973, two barges, CW-7 and SR-354, broke loose from their moorings and floated downstream, where they struck the plaintiff's docking and mooring facility.
The defendants are Taylor Towing Service, Inc. (hereinafter referred to as Taylor), and Security Barge Line, Inc. (hereinafter referred to as Security). At the time of the collision Security was the owner of both CW-7 and SR-354. Security filed a crossclaim against Taylor, owner of the harbor boat which had towed and moored the barges prior to the collision.
Count I of plaintiff's complaint alleges, generally, that the breakaway, collision and damages to plaintiff were caused by the fault and neglect on the part of either or both defendants under the doctrine of res ipsa loquitur.
In Count II plaintiff pleaded that the breakaway, collision and damages to its docking and mooring facility were caused by the fault and neglect on the part of either or both defendants.
Security, in its crossclaim against Taylor, alleged that Taylor warranted to it that it would detach and fleet barges CW-7 and SR-354 in a workmanlike manner, and accordingly any damage which resulted was caused by Taylor's negligence and its *811 breach of warranty of workmanlike service to Security. Security further stated that if it is found to have any liability to plaintiff by reason of the main complaint, then under admiralty maritime law Taylor is liable to indemnify Security for any judgment rendered against it and for reasonable costs and attorneys fees in defense thereof.
In its answer to Security's crossclaim, Taylor specifically denied that it is engaged in the business of fleeting and refleeting barges. Taylor further denies that it breached a warranty of workmanlike service or that it is liable to indemnify Security for any judgment rendered against Security.
This action was timely filed in the Eastern Division of Missouri, but it was subsequently transferred to the Southeastern Division of Missouri pursuant to Taylor's motion. This Court has jurisdiction in admiralty. In accordance with the Court's pre-trial order, all of the parties have stipulated to the uncontested facts as set out in the first two pages of Stipulation of Uncontested Facts filed on May 5, 1975, which is marked Exhibit 1 by the Court, attached hereto and made a part of this opinion. In addition, plaintiff and defendant Security have stipulated to certain uncontested facts with respect to the measure of damages as set out on page 817 of said Exhibit 1.
Furthermore, the credible testimony, pleadings and exhibits disclose that Security is engaged in the business of operating barges on the Mississippi River. Prior to January of 1973, Security entered into an agreement with Noranda Aluminum Company (hereinafter referred to as Noranda) whereby Security was to deliver barges loaded with aluminum to Noranda's dock at New Madrid, Missouri.
Taylor is in the business of operating a harbor boat, among other activities, near New Madrid, Missouri, for the purpose of taking barges off tows and putting barges on tows in the Mississippi River, but it was not a fleeting service. Security and Taylor entered into an oral agreement with respect to a specified price for barge movements. Taylor agreed to take loaded barges off a tow for $125.00 per barge or to return an empty barge to the tow for the same price. If it took them off a tow, Taylor was to deliver the loaded barges to the Noranda dock if it was available. If it were not available, Taylor would take the barges along the shoreline downstream and tie them off to the trees. Taylor neither owned nor maintained the area where the barges are tied off. When Noranda's dock became available, Noranda could notify Taylor to move the barges in to Noranda's dock. Noranda paid Taylor $75.00 per barge for this additional movement. All of Taylor's movements and charges thereon were based upon one-way contracts.
Neither the agreement between Taylor and Security nor the agreement between Taylor and Noranda expressly called for Taylor to assume custody or control over the barges. Furthermore, those agreements did not expressly call for periodic inspections over barges while they were moored to the trees along the shoreline. Taylor used the lines from previous Security barges to moor CW-7 and SR-354, and Taylor's employees inspected these lines to see that they were safe before they tied off the barges to the trees.
The agreement between Security and its customer Noranda called for Noranda to have eight days of "free time" for loading and unloading the barges without additional charge. In excess of those eight days of "free time", Security charged Noranda $50.00 per day for each barge for the first twelve days and $75.00 per day thereafter. Noranda's "free time" began when Taylor detached the barges from Security's tow, and it ended when the barge was released empty to Security. However, no part of Taylor's charges to Security were based upon the time that the barges were held. Pursuant to Security's agreement with Noranda, Security was required to perform one placement of the barges without additional charge, and any additional placement would be for Noranda's account and charge.
*812 On January 29, 1973, the lines furnished by Security which were used by Taylor to tie off the barges, CW-7 and SR-354, to the trees, broke in two for some unexplained reason, and the two barges floated downstream where they struck and damaged a piling at Pasco's docking facility. This docking facility consists of a total of three sets of pilings and they are known as "dolphins". The dolphin in question was built in 1972 and consists of a cluster of eight, 85 foot long, 14 inch I-beams driven 30 feet into the riverbed in a circle 9 feet in diameter. It is connected by pieces of 10-inch channel iron, and is located 150 feet from the low water mark of the river.
After the collision on January 29, 1973, Taylor's employees retrieved Security's barges which had struck the dolphin and returned them to Noranda's dock without charge. On February 8, 1973, Taylor placed them in the tow of Security's M/V Washington.
All of the parties in this case agree that when a collision is caused by a vessel drifting from her moorings, the moving vessel is presumed to be at fault until the presumption is offset by affirmative proof that absolves her. The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1866); Monsanto Co. v. Port of St. Louis Investments, Inc., 350 F.Supp. 502 (E.D.Mo.1972), aff'd per curiam, No. 72-1689 (8th Cir., Oct. 19, 1973); Monsanto Co. v. Edwards Towing Corp., 318 F.Supp. 13 (E.D.Mo.1969). This is equally true where, as here, the suit is in personam against the owner of the moving vessel. Burns Bros. v. Long Island R. Co., 176 F.2d 406 (2nd Cir. 1949). Plaintiff relies upon this presumption in its claim for relief. Therefore, the burden of proof of exoneration from liability rests with Security. Monsanto Co. v. Port of St. Louis Investments, Inc., 350 F.Supp. at 516.
Defendant Security claims that it has offset the presumption in two ways. Security seeks, first, to establish that the agreement between it and Taylor resulted in a bailment and not simply a contract for towage. As bailee of the barges while they were tied to the trees, Security contends that Taylor is solely responsible for explaining any damage resulting from the subsequent breakaway and collision. Second, Security asserts that proof of a bailment is unnecessary to offset the presumption because the reasonable implications of the agreement required Taylor's continuing care on behalf of CW-7 and SR-354 while they were tied off to the trees because those barges were still awaiting their final destination.
Defendant Taylor claims that its agreement with Security constituted a contract for towage only, and, therefore, no bailment arose. Furthermore, Taylor states that the terms of the towage contract did not call for continuing care for those barges tied off to the trees. Having discharged its duties with regard to mooring the barges securely at their final destination, Taylor claims that it is without fault.
With respect to its first contention, Security must establish that the agreement between it and Taylor resulted in a bailment and not a contract for towage. "Towage" is defined at 70 Am.Jur.2d, "Shipping", § 560:
"In a broad sense, towage is the supplying of power by a vessel to tow or draw another. Many vessels, such as barges and canal boats, have no power of their own and are built with a view to receiving their propelling force from other sources. * * * An ordinary towing service may be defined as the employment of one vessel to aid in the propulsion or to expedite the voyage of another, when there is no circumstance of peril, and nothing more is required than the acceleration of her progress." (Footnotes omitted.)
"Bailment" was defined by this Court in Mid-America Transportation Co. v. St. Louis Barge Fleeting Service, Inc., 229 F.Supp. 409, 411 (E.D.Mo.1964), aff'd 348 F.2d 920 (8th Cir. 1965), in the following manner:
"As a general rule, delivery by the bailor and acceptance of the subject matter of the bailment creates the bailment *813 (see 6 Am.Jur., 663). Of course, such delivery and acceptance must be made for some particular purpose upon an express or implied contract to re-deliver the goods when the purpose has been fulfilled or to otherwise deal with the goods according to the bailor's directions. See, e. g., Earhart v. Callan, 9 Cir., 221 F.2d 160, cert. denied 350 U.S. 829, 76 S.Ct. 59, 100 L.Ed. 740, where the court cited 8 C.J.S. Bailments §§ 1, 3, as authority for this general principle."
In Stevens v. The White City, 285 U.S. 195, 200, 52 S.Ct. 347, 349, 76 L.Ed. 699, 702 (1932), the Supreme Court held that "a contract merely for towage does not require or contemplate such delivery as is ordinarily deemed essential to bailment." Therefore, a contract for towage, alone, will not necessarily result in a bailment. The key distinction between a mere towage contract and a bailment is the type of "delivery" required by the service.
It appears that Security has confused the service which Taylor provided with that involved in the operation of a fleeting or docking facility. The latter situations require an owner to deliver custody and control of his barge to such an operator. The rule ordinarily is that where the use of a docking facility is for the mutual benefit of the dock owner as well as the vessel making use of such a facility, there is a duty incumbent upon both parties to exercise reasonable care under the circumstances. Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756, 758 (1898); Valentine v. Pennsylvania Railroad Co., 131 F.Supp. 108, 109-110, aff'd per curiam 101 F.2d 1011 (2nd Cir. 1939). Where the parties create a relationship of this type, a bailment results which imposes upon the bailee the duty of ordinary care with respect to the vessel and her cargo. In re Flowers, 526 F.2d 242 (8th Cir. 1975); Stegemann v. Miami Beach Boat Slips, Inc., 213 F.2d 561, 564 (5th Cir. 1954); Mid-America Transportation Co., supra, at 411-412. Proof that a vessel was delivered to the bailee in good condition and was damaged thereafter while she was in the exclusive possession and control of the bailee, establishes a presumption of negligence. Erlbacher v. Republic Homes Corp., 263 F.2d 217 (8th Cir. 1959). Application of the presumption does not mean that the burden of persuasion shifts from the bailor to bailee; it only shifts the burden of the production of evidence. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110-111, 62 S.Ct. 156, 160-161, 86 L.Ed. 89, 95-96 (1941). Usually, in these types of cases, only the vessel and her cargo are in bail to the fleeter and, therefore, it is only damage to them which results in the application of the presumption. However, where there is proof that the vessel was delivered to the bailee in good condition, and the vessel is the direct cause of damage to a third party, the presumption against the bailee should be applied, nevertheless. See Monsanto Co. v. Port of St. Louis Investments, Inc., 350 F.Supp. at 518. Here, however, the evidence indicates that Taylor neither owned nor operated a fleeting facility and it did not assume custody or control of the barges. Taylor only provided propulsion for Security's barges. Therefore, this Court finds that the service in question constituted a contract for towage, only, and not a bailment.
In the alternative, Security argues that proof of a bailment is unnecessary to rebut the presumption imposed upon it. Citing two of Judge Learned Hand's opinions, Thorne, Neale & Co. v. Reading Co., 87 F.2d 694 (2nd Cir. 1937) and The Helderberg, 94 F.2d 649 (2nd Cir. 1938), Security contends that the reasonable implications of the towage contract required Taylor's continuing care on behalf of those barges tied off to the trees because they were still awaiting their final destination.
In both Thorne, Neale & Co. and The Helderberg, the Second Circuit was confronted with the situation wherein a tower temporarily moored its tows, which were awaiting their final destination, in a chute or pier which was under the control of the tower. Since the barges are still *814 undelivered at that point, the responsibilities of the tower must be carried out for a longer period of time. Where loaded barges are temporarily moored at the tug owner's pier because they are still awaiting their final destination, the tower has a duty to "mind" the barges while they are there. Daly v. Reading Co., 220 F.2d 534, 535-536 (2nd Cir. 1955); Thorne, Neale & Co., supra at 697. The absence of the barges' owner from the scene imposes upon the tower additional responsibilities which are even greater than those required of a fleeter.
In circumstances such as these, the mere towage contract has been confused with a bailment. The distinction between the two legal terms was explained by Judge Hand in Thorne, Neale & Co., supra at 696-697, where he states:
"The respondent relies upon Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, to absolve it from any such duty. That case did authoritatively settle it that a tug is not the bailee of its tow, and it was necessary to decide the point, because if so, the libellant had not made out a prima facie case. He had relied upon the presumption of fault arising in cases of bailment from a return in bad condition of the bailed property. That was all that the case decided; the court was not concerned with the duties of the tug arising out of the contract of towage, and certainly did not mean to change the law about them. It is quite true that in holding a tug for failure to protect the tow, we have at times spoken of the situation as one of bailment; that was indeed the cause of the doubts that were laid by Stevens v. White City, supra; and the temptation is strong where the contract involves towing a barge, holding her at the tower's convenience, lading her and towing her back. * * * Perhaps it is not unnatural therefore that the opinion should apparently have become current that the basis of the tower's duty to care for the tow is a bailment, and that if there be no bailment there will be no duty. Nevertheless, there is no reason for connecting the two, and their confusion illustrates the danger of the loose use of legal terms. Barges taken on such a contract are not in bail to the railroad, which has little possession of them as of any other tow; the situation is not an exception to the general doctrine. The source of the railroad's duties is the contract by which it engages to take the vessels, lade them and bring them back; and the question is of the reasonable implications of that undertaking."
Judge Hand spoke to this point again in The Helderberg, supra at 651, where he further restated his position:
"We have so often held that a tug must take reasonable care of barges in circumstances such as these, that we are a little surprised at the persistency with which the point is still contested. True, before Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, the doctrine had several times been based upon a suppositious bailment; but we tried to make it clear in Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694, that that was not in the least necessary to the result; and we might have added that it did not even tend to support it, for there is as much reason to say that the bailment, if one had existed, would have ended with delivery at the stakes, as that the towage contract does. The only question is always of the implications of the transaction, taken as a whole."
Were the Court to rely upon these cases, Security might successfully offset the presumption imposed upon it. However, the Court is of the opinion that neither Thorne, Neale & Co. nor The Helderberg is controlling here for three reasons. First, the evidence indicates that Taylor neither owned nor maintained a docking service at the shoreline area downstream where it tied off the barges to the trees when Noranda's dock was unavailable. Second, the towers in Thorne, Neale & Co. and The Helderberg loaded their tows with coal at their own *815 convenience.[1] Here, however, Noranda did its own unloading and it was at its own convenience. Hence, Taylor should not have to mind the barges once the unavailability of Noranda's dock has dictated the mooring of the barges downstream.
Finally, in both The Helderberg and Thorne, Neale & Co., Judge Learned Hand assumed that the barges' journey was to be round trip, thereby requiring the tower's duty to "mind" the barges to be for a period of longer duration. In Doherty v. Pennsylvania R. R. Co., 269 F. 959, 962 (2nd Cir. 1920), upon which Judge Hand relies in The Helderberg case,[2] the Court quotes from the trial testimony of the plaintiff:
"`Q. Do you mean to say that all you do is tell the Pennsylvania people that you have a boat that wants to be taken to South Amboy, and they automatically put their coal in that boat and send it back?
"`A. Yes.'" (Emphasis added.)
Security, in the present case, also assumes that its agreement with Taylor called for round trip barge movements. However, the credible testimony of Mr. Taylor, sole shareholder of Taylor, indicates that the oral agreement which he had entered into with Security was of a different nature:
"Q Is it a continuing oral contract or does it have any length of time involved in it?
"A No, sir.
"Q What is the practice? Do they call you each time they need you?
"A Yes, sir." (Tr. 81.)
Mr. Taylor's testimony is reinforced by the fact that Taylor's charges and Security's payments were based upon each one-way movement. In fact, once Taylor tied the barges off to the trees for Security, their contract was terminated. Noranda then had to call and ask Taylor to move the barges into its dock while it was available. Taylor charged Noranda, not Security, for this service. There was no reference in the record to any time at which Security requested a round trip movement. Therefore, the Court has determined that Security and Taylor had an agreement with respect to price only, and it was terminable at the will of either party. By making such a determination, the only conclusion which can be reached is that the trees along the shoreline were the final destination of the barges, CW-7 and SR-354. The "reasonable implications" of a one-way towage contract would not require Taylor to assume a continuous duty to inspect the barges if they had completed their journey.
Since the trees along the shoreline were the barges' final destination and since there was no express understanding with respect to a continuing duty on Taylor's part to inspect those barges tied off to the trees, Security's second contention is without merit and Taylor's responsibilities were limited to only those which accompany a towage contract. The completion of the towage service is described at 86 C.J.S. Towage § 63
c. (1) in the following manner:
"The tugs task, however, is completed and the tower is discharged from further responsibility when the tug has brought her tow to the place of final destination, and moored or landed her safely, in a berth apparently safe, or as safe as conditions permit, and, if damage occurs thereafter, the tug is not responsible, since she is not under a duty to stand by for protection of the tug thereafter." (Footnotes omitted.)
Taylor was, therefore, discharged from further responsibility when its harbor boat had brought CW-7 and SR-354 to the place of their final destination and moored or landed them safely in a berth apparently *816 safe. These duties were completed by Taylor because its employees inspected the lines, which were furnished on Security's own barges, for defects before they moored the barges with them. This Court finds that Taylor met its towage contract responsibilities with respect to CW-7 and SR-354. Therefore, Taylor is not liable to the plaintiff.
Since Taylor's responsibilities with respect to CW-7 and SR-354 ended when it properly secured and moored the barges to the trees along the shoreline, Security's burden to offset the presumption imposed upon it remains. Security has, however, failed to affirmatively prove that it was without fault. The evidence indicates that the lines which Taylor used to tie off the barges were originally from Security's own barges. Security did not return to inspect its barges or its lines. Therefore, Security has failed to offset the presumption imposed on it, and it is liable to Pasco for the damages which its dolphin sustained in the collision. With respect to Security's crossclaim against Taylor, this Court finds that Taylor is not liable to Security for indemnity due to the determination above that Taylor is without fault.
Concerning damages, Pasco and Security have stipulated that the measure of damages with respect to the dolphin is the difference in the fair market value of the facility immediately prior to and after the collision. They further stipulated that a reasonable estimate of this difference in market value is the cost of repairs to place the facility in the same condition as it was prior to the collision. That cost of repair was stipulated during the trial to be $36,250.00 on April 28, 1975.
Plaintiff further requests interest which has accumulated from the date of filing the complaint, May 31, 1974. In Mid-American Transportation Co., Inc. v. Cargo Carriers, Inc., 480 F.2d 1071, 1074 (8th Cir. 1973), the Court stated:
"This Court has recently followed the recognized general rule in admiralty suits permitting, in the discretion of the trial court, the award of prejudgment interest unless there are exceptional or peculiar circumstances. Mid-American Transportation Company v. Rose Barge Line, Inc., 477 F.2d 914 (8th Cir. 1973)."
No peculiar or exceptional circumstances exist which would justify denial of prejudgment interest.
Accordingly, for the above reasons the Court finds in favor of the plaintiff and against the defendant Security in the amount of $36,250.00 plus interest at six percent on said amount from May 31, 1974, and finds in favor of the defendant Taylor and against plaintiff on plaintiff's cause of action. Furthermore, with respect to the crossclaim which Security filed against defendant Taylor, the Court finds against Security and in favor of Taylor.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law and the clerk of the Court is directed to prepare and enter the proper judgment as set out above.

Exhibit 1 to Court's Opinion

STIPULATION OF UNCONTESTED FACTS
Come now the parties hereto and stipulate that the following facts are uncontested:
1. Plaintiff is a corporation duly qualified to do business in the State of Missouri, having a place of business in New Madrid, Missouri.
2. Defendant Taylor Towing Service, Inc. ("Taylor") is a corporation organized and existing according to the laws of Missouri and having a place of business in Caruthersville, Missouri.
3. Defendant Security Barge Line, Inc. ("Security") is a corporation organized and existing according to the laws of Mississippi having its principal place of business in the State of Mississippi.
4. At all times relevant to this cause of action, plaintiff was the owner of a docking and mooring facility on the Missouri bank *817 of the Mississippi River and in the Mississippi River near New Madrid, Missouri.
5. At all times relevant to this cause of action, defendant Security was the owner of barges CW-7 and SR-354.
6. On or about January 26, 1973, pursuant to an agreement between defendant Taylor and defendant Security, defendant Taylor detached barges CW-7 and SR-354 from the M/V HARRIETT ANN operated by the Upper Mississippi Towing Corporation and moored said barges at a position on the Missouri shore of the Mississippi River at a point upstream of plaintiff's docking facility.
7. On or about January 29, 1973, and after the time when defendant Taylor moored said barges on the Missouri shore, said barges floated downstream, unattended, and collided with plaintiff's docking facility.
 Respectfully submitted,
 BRYAN, CAVE, McPHEETERS & McROBERTS
 By (s) Robert G. Brady 
 Robert G. Brady
 C. Perry Bascom
 David S. Slavkin
 500 North Broadway
 St. Louis, Missouri 63102
 231-8600
 Attorneys for Plaintiff
 WARD & REEVES
 By (s) James E. Reeves 
 James E. Reeves
 Caruthersville, Missouri 63830
 333-2396
 Attorneys for Defendant Taylor
 Towing Service, Inc.
 THOMPSON & MITCHELL
 By (s) Michael D. O'Keefe 
 Michael D. O'Keefe
 705 Olive Street
 St. Louis, Missouri 63101
 231-0545
 Attorneys for Defendant Security
 Barge Line, Inc.

ADDITIONAL STIPULATION
Come now plaintiff Pasco and defendant Security and, in addition to the above uncontested facts stipulate that the following facts are uncontested:
8. Plaintiff's docking facility was damaged when the aforementioned barges collided with it.
9. The measure of damages in this case is the difference in the fair market value of the facility immediately prior to the collision and immediately after the collision.
10. The cost of repairs to place the facility in the same condition as it was prior to the collision is a reasonable estimate of this difference in market values.
11. The cost of repair and replacement of the damaged portion of plaintiff's facility to return it to the same condition as it was in prior to the accident was estimated by Patton-Tully Transportation Company, a qualified contractor, to be $35,000 on September 12, 1973 and to be $36,250 on April 28, 1975 and said estimates are reasonable.
 Respectfully submitted,
 BRYAN, CAVE, McPHEETERS & McROBERTS
 By (s) Robert G. Brady 
 Robert G. Brady
 C. Perry Bascom
 David S. Slavkin
 500 North Broadway
 St. Louis, Missouri 63102
 231-8600
 Attorneys for Plaintiff
 THOMPSON & MITCHELL
 By (s) Michael D. O'Keefe 
 Michael D. O'Keefe
 705 Olive Street
 St. Louis, Missouri 63101
 231-0545
 Attorneys for Defendant Security
 Barge Line, Inc.
NOTES
[1] "Having by implication the power to suit their convenience in loading and returning the boats, the roads are under the correlative duty to mind them while they are there * * *." Thorne, Neale & Co., supra at 697.
[2] In The Helderberg, supra at 651, Judge Hand stated:

"In Doherty v. Pennsylvania R. R. Co., 2 Cir., 269 F. 959, the testimony as here * * was merely that the owner asked the road to tow the barge to the Amboys to be filled with coal. Again we assumed it was to be a round trip." (Emphasis added.)