350 F.Supp. 502 (1972)
MONSANTO COMPANY, a corporation, Plaintiff,
v.
PORT OF ST. LOUIS INVESTMENTS, INC., a corporation,
and
Santa Maria Corporation, Inc., a corporation, Defendants.
No. 70 A 17(A).
United States District Court, E. D. Missouri, E. D.
October 11, 1972.
*503 *504 Goldstein & Price, St. Louis, Mo., for plaintiff.
Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for Port of St. Louis Investments, Inc.
Warren M. Faris, New Orleans, La., Joseph M. Kortenhof, Wayne L. Millsap, Morris, Wuestling & James, Lucas & Murphy, St. Louis, Mo., for Santa Maria Corp., Inc.

*505 MEMORANDUM AND ORDER
HARPER, District Judge.
Plaintiff, Monsanto Company, brought suit in admiralty claiming the sum of $439,972.63 for damages caused to its marine terminal at Sauget, Illinois, Mile 178, Upper Mississippi River, on June 28-29, 1969. On that date a flotilla consisting of the riverboat restaurant BECKY THATCHER, its mooring barge, a visitors' barge, and the SANTA MARIA (a replica of the vessel in the fleet of Christopher Columbus) broke loose from its moorings in St. Louis Harbor and floated downstream, where the BECKY THATCHER struck the Monsanto facility broadside.
The four defendants named in the amended complaint were Port of St. Louis Investments, Inc. (hereinafter referred to as Port of St. Louis), Santa Maria Corporation, Inc., Inland Waterways, Inc., and Gateway Harbor Service, Inc. At the time of the collision Port of St. Louis was owner of the BECKY THATCHER and Santa Maria Corporation was owner of the SANTA MARIA. Port of St. Louis filed a crossclaim against Santa Maria Corporation. Santa Maria Corporation filed a crossclaim against Port of St. Louis. Prior to the commencement of trial, plaintiff dismissed as to Inland Waterways, Inc. and Gateway Harbor Service, Inc., and those defendants dismissed their respective crossclaims.
Plaintiff's amended complaint alleges that the breakaway, collision and damages to plaintiff were caused by the fault and neglect on the part of defendants, Port of St. Louis and Santa Maria Corporation, because: a) defendants failed to have the BECKY THATCHER or SANTA MARIA adequately and securely moored; b) defendants, under the circumstances and conditions, failed to use adequate and seaworthy mooring lines, cables and equipment in the mooring of the BECKY THATCHER and/or the SANTA MARIA; c) defendants caused or permitted the SANTA MARIA to be moored in a dangerous and hazardous place; and d) defendants failed and neglected to take adequate precautions under the weather and other conditions existing at the time of the casualty. In the alternative, plaintiff pleaded that if the Court should find that the damage to plaintiff's terminal was not caused by specific acts of fault or neglect on the part of defendants, that there must be a presumption of negligence under the doctrine of res ipsa loquitur.
Port of St. Louis in its answer denied that the casualty was the result of any fault or neglect on its part but was, instead, solely caused by an act of God. Port of St. Louis also asserted that its liability was limited to the value of the BECKY THATCHER, but abandoned this theory in the trial.
Santa Maria Corporation in its answer also denied any fault or negligence on its part and alleged that the casualty was occasioned without the privity or knowledge of Santa Maria Corporation, and that if it were liable plaintiff was not entitled to recover damages in excess of the value of Santa Maria Corporation's interest in the SANTA MARIA at the conclusion of the voyage, one dollar.
Port of St. Louis, in its crossclaim against Santa Maria Corporation, alleged that if Port of St. Louis is found liable to plaintiff, such liability is the direct and proximate result of the mooring of the SANTA MARIA outboard of the BECKY THATCHER. Port of St. Louis alleges that it entered into a contract with Santa Maria Corporation whereby Santa Maria Corporation agreed to protect and hold harmless Port of St. Louis from all claims and losses such as are involved in this lawsuit, together with fees and expenses, and that Santa Maria Corporation agreed to take out public liability insurance against such losses. Port of St. Louis alleges that, by reason of the principles of common law indemnity and by reason of the breach by Santa Maria Corporation of its contractual obligations, Port of St. Louis is entitled to reimbursement of all fees, costs and expenses attendant *506 to its defense and, in the event of a judgment against Port of St. Louis, a judgment against Santa Maria Corporation in equal measure.
Santa Maria Corporation, in its crossclaim, alleged that the casualty was exclusively caused by the negligence and carelessness of Port of St. Louis in failing to have the BECKY THATCHER and the mooring barge adequately and securely moored, in failing to use adequate and seaworthy mooring lines, cables and equipment in the mooring of the BECKY THATCHER and the mooring barge, and in failing to take adequate precautions under the weather and other conditions existing at the time of the casualty. In the alternative, Santa Maria Corporation pleaded that, if the Court should find that the damage to plaintiff's terminal was not caused by specific acts of fault or negligence on the part of Port of St. Louis, there must be a presumption of negligence under the doctrine of res ipsa loquitur. In Count I of its crossclaim Santa Maria Corporation alleges that Port of St. Louis is liable to it for all losses it may suffer if it is held liable to plaintiff in whole or in part. In Count II Santa Maria Corporation claims Port of St. Louis is liable for damages of $406,519.49 to the SANTA MARIA and salvage expenses of $56,458.02.
This action was timely filed and this Court has jurisdiction in admiralty. The pleadings, testimony and exhibits disclose that plaintiff is a corporation with its general offices located in the County of St. Louis, Missouri. It is the owner of a marine terminal located on the Illinois side of the upper Mississippi River at about Mile 178 in the St. Louis Harbor. The terminal has five storage tanks which store chemicals that are loaded and unloaded from barges. Pipelines run from the tanks to the barges. The pipelines are on a pipebridge 375 feet long which is made up of three 125-foot sections. One end of the bridge is anchored on the land and the other is anchored on a cell in the river. The bridge is supported at two intermediate points by A-frames. The bridge contains five product lines. The testimony as to the contents of these product lines varied. The chemicals mentioned were benzene, sulphuric acid, light soft alkylbenzene, heavy soft alkylbenzene, molten sulfur, and alkyl olefin. In addition to the product lines, there is a steam line, a water line and an air line.
Port of St. Louis is a corporation with its offices and place of business in the City of St. Louis. On June 28, 1969, Port of St. Louis was the owner of the riverboat BECKY THATCHER, which was used as a floating restaurant, museum and gift shop. The BECKY THATCHER is 220 feet long and 39 feet wide. It has a five-foot draft, a steel hull, and a wooden superstructure with steel structural members. The BECKY THATCHER was moored to a mooring barge which was, in turn, moored to the shore. The mooring barge (owned by Port of St. Louis) is 150 feet in length, 37½ feet wide, and has a 3-foot draft. Also contained in the fleet was a small barge (owned by Port of St. Louis) used as a visitors' center. It was approximately 46 feet in length and 20 feet wide with a depth of about 6 inches. The total tonnage of the BECKY THATCHER, the mooring barge, and the visitors' center was approximately 700 tons.
The MISSISSIPPI BELLE, an excursion vessel with a weight of 60 tons, was moored to the BECKY THATCHER when the MISSISSIPPI BELLE was in the harbor, but she was not part of the flotilla at the time of the breakaway. This vessel was owned by a corporation operated by Frank Pierson, who was also the President of Port of St. Louis.
Santa Maria Corporation is a corporation with its offices and place of business in the City of St. Louis. Until February 5, 1970, Santa Maria Corporation was the owner and operator of the SANTA MARIA. The SANTA MARIA was a wooden-hulled, round bottom boat, 80 feet long and 25 feet wide with an overall depth of 35 feet. She had a gross weight of approximately 110 tons.
*507 Ordinance 51391 of the City of St. Louis (Ex. 6), approved June 27, 1962, repealed seven chapters of the Revised Code of the City of St. Louis relating to watercraft, wharves, the harbor and riverfront of the City of St. Louis, and enacted in lieu thereof eight chapters pertaining to the same subject matter. The Ordinance contained the following clause:
"295.030 Permit Required for Extended Stays. No vessel or watercraft not moored to a wharfboat, float, or other landing facility shall be permitted to remain at the improved wharf for a period of longer than three days, unless a temporary permit therefor is obtained from the Director of Streets or unless a permit is issued by the Board of Public Service under terms and conditions fixed by said Board, and at the rate applicable to wharfboat privileges set out in Section 295.070."
Port of St. Louis obtained a permit (Ex. 9) to moor the BECKY THATCHER on January 8, 1968. This permit contained the provision that "[t]he permittee shall not allow any vessel of a commercial nature to moor to said facility without the permission of the Director of Streets." On June 6, 1968, Port of St. Louis obtained a permit (Ex. 10) to occupy the BECKY THATCHER with a restaurant, museum and gift shop. This permit contained among its conditions the following:
"10.2 No vessels are permitted to tie up riverside of this public assembly vessel without prior approval from the Department of Streets. Signs shall be posted fore and aft on hull warning such vessels that:
"Boats and Other Vessels are Prohibited by St. Louis B.P.S. Permit No. ______ from mooring or attaching to this vessel."
On June 28, 1969, the BECKY THATCHER did not carry such warning signs.
Santa Maria Corporation received a written temporary permit from the Director of Streets allowing it to moor on April 10, 1969 (Ex. 11). This temporary permit expired on June 10, 1969. No written permit was ever given which extended the April 10th permit. However, Larry Unland, who was Director of Streets for the City of St. Louis during this period, testified that he orally extended the permit to such time as the SANTA MARIA could promptly be moored in the location assigned to it.
On April 10, 1969, the SANTA MARIA was added to the flotilla. Frank Pierson, President of Port of St. Louis, entered into an agreement with Santa Maria Corporation. The document recited that Santa Maria Corporation wished to tie up the SANTA MARIA to the BECKY THATCHER and use the BECKY THATCHER as a means of ingress and egress for visitors, employees and officers. The document then set forth:
"1. First Party (Santa Maria Corporation) agrees to bear all expenses of tying up to Second Party (Port of St. Louis) and to be responsible for any damage or loss subsequently caused to Second Party by such mooring, by the eventual removal of the Santa Maria, by visitors, employees or officers while in passage to or from First Party's ship, the Santa Maria.
"2. First Party agrees to pay five dollars ($5.00) per day for each day so tied up to Second Party.
"3. Second Party agrees to provide convenient access over its decks and passageways to visitors, employees or officers of First Party.
"4. First Party agrees to indemnify and hold harmless Second Party against any loss, including costs and fees on account of any action brought against Second Party for injury or damages from any cause whatsoever arising out of and as a result of the tying up and the providing of access over its decks and passageways.
"5. First Party further agrees to take out * * * public liability insurance * * * to protect against *508 any liability to the public incident to the use of or resulting from any accident occurring in our about said steamer as a result of this Agreement * * *."
Before this agreement was reached not only representatives of Santa Maria Corporation, but also personnel from the Mayor's office and the Street Department requested that the SANTA MARIA be allowed to moor to the BECKY THATCHER. Port of St. Louis did not want to renew the agreement when it expired on May 31st. Personnel from the Mayor's office and from the Department of Streets again contacted Port of St. Louis. On June 3rd the agreement was extended in writing until June 30th (Ex. 14).
The St. Louis area, including the riverfront where the flotilla was moored, experienced a severe storm on the night of June 28, 1969. The dispute between the parties in regard to the weather conditions centers upon the question of the extent of the velocity at ten o'clock that evening at the area of the riverfront where the flotilla was moored. Plaintiff and Port of St. Louis both presented weather experts as witnesses. These witnesses came to entirely different conclusions about the velocity of the wind hitting the flotilla.
The National Severe Storms Forecast Center at Kansas City, Missouri, issued two severe thunderstorm watches for the St. Louis area the night of June 28th, but issued no tornado watches that night.
The St. Louis Weather Station, which is located at Lambert Airfield, some twelve to thirteen miles northwest of the riverfront, issued a tornado warning on June 28th for the St. Louis area, at 9:10 p. m., which warning was based on the reported sighting of a tornado eight miles northeast of St. Charles, Missouri. At 10:00 p. m. the weather station issued a tornado warning for persons in St. Clair, Monroe and Randolph Counties. This warning was based on the reports of numerous tornadoes in St. Louis County by the public. None of the tornadoes reported on June 28th were ever verified by the weather bureau however.
The photographs of the radar observations (Exs. 29-A29-DD) taken at Lambert Field show three separate areas of precipitation. Two were present at 7:00 p. m. (Ex. 29-F). One area was to the southwest of St. Louis and the other area, a long line of precipitation tangential to the St. Louis area, was to the northwest of St. Louis. By 8:42 p. m. (Ex. 29-L) the area to the southwest had remained relatively stationary in position while the line of precipitation to the northwest had moved much closer to St. Louis. At 9:20 p. m. (Ex. 29-P) the center of the northwest line had reached Lambert Field while the western portion of the northwest line was very close to the still stationary southwest area. A third area of precipitation, a very small area, appeared to the southeast of St. Louis. By 9:32 p. m. (Ex. 29-V) the southwest area had not yet completely merged with the northwest line. The area of precipitation to the southeast enlarged and a short series of cells appeared which ran in a line northwest from the original cell. From 9:32 to 9:38 p. m., there was a camera malfunction. The camera then went blank until 10:37 p. m. due to a power failure at the weather station. However, the radar was still functioning. Radar depiction charts (Ex. 27) and radar observation data indicate what was on the radar at 9:42 p. m. The radar depiction chart for 9:42 p. m. (Ex. 27-C) shows that the northwest line of precipitation had reached the northern part of St. Louis at this time. The southwest area is shown to have partially merged with the northwest line. The areas of precipitation to the southeast of St. Louis that were evident on the radar at 9:32 p. m. are not depicted in any way by the 9:42 p. m. radar depiction chart. The radar weather observation data gives the same information as the radar depiction chart. Both the radar chart and the radar data were only reported hourly. *509 Therefore, there is no evidence of what radar showed from 9:42 p. m. until the camera began taking pictures of the radar screen again at 10:37 p. m. By 10:37 p. m. the heaviest area of precipitation had passed over the city and there was only one irregular-shaped area of precipitation.
The surface weather observations recorded by the weather bureau at Lambert Field (Ex. 25) shows that at 9:54 p. m. at Lambert Field there was a wind speed of 30 knots (34½ miles per hour) with gusts of 45 knots (51¾ miles per hour), and that the air pressure was rapidly rising, which is an indication that the worst part of the storm had passed. Data under the heading "Remarks, Notes, and Miscellaneous Phenomena" shows that the fastest one-minute windspeed recorded occurred at 9:54 p. m., but indicated that some readings were missed due to the power failure at the weather bureau. Radar weather observations show that the speed of the storm cells at 9:42 p. m. was 40 knots (46 miles per hour).
The weather expert testifying for Port of St. Louis, Charles Umpenhour, stated that his testimony was based upon the weather information available from the St. Louis Weather Bureau, upon data obtained from the National Severe Storm Center in Kansas City, and upon energy maps obtained from other weather stations. The witness Umpenhour drew a diagram (Ex. G-3) which depicted the surface conditions of temperature, moisture, air mass contract, and air pressure in the St. Louis area at 10:00 p. m. According to this diagram there was a thunderstorm high pressure area in northwestern St. Louis and a small low pressure center 25 to 30 miles southwest of St. Louis.
According to another diagram (Ex. G-5), this low pressure center had moved in from the southwest. Umpenhour used the 7:00 p. m. energy diagrams from various weather stations (Exs. G-19-A & B, G-20-A to D, and G-21) and data from the Severe Storm Center at Kansas City (Exs. G-15 to 17) to calculate the potential straight line winds at ground level in St. Louis. He testified that according to his calculations the ground winds in St. Louis would be 54 miles per hour if the storm cells were stationary. Because the cells in the northwest line of thundershowers were actually moving at 46 miles per hour (Ex. 26), the actual straight ground wind would be the sum of these two motions, 100 miles per hour.
The damage to the St. Louis area caused by the storm was not great as it consisted primarily of blown-over trees. The only proof of damage to buildings was as to one building in St. Charles and two in downtown St. Louis. Although Umpenhour contended that the location of the damage formed a pattern that evidenced two separate paths of wind, one approaching the riverfront from the northwest and the other from the southwest, the most detailed depiction of the totality of the damages offered into evidence (Ex. 36) fails to substantiate this contention. Damage does not appear to have escaped any particular section of the city or the county. The damage pattern is inconclusive. It provides no more of a basis for the theory of destructive winds from both the northwest and the southwest than it does for the theory that the wind from the northwest was the sole cause of the damage to the St. Louis area. Furthermore, Umpenhour testified that the low pressure area which he contended entered the City of St. Louis contained circular winds that were not destructive but which increased the energy of the wind system from the northwest when they met (Tr. 888).
The witness Umpenhour concluded that there was a cyclonic circulation 100 feet wide at the riverfront at 10:00 p. m. This conclusion was based on the damage report to a building in St. Charles and a building in downtown St. Louis, in addition to reports on the motion of the riverboats BECKY THATCHER and the GOLDENROD. Umpenhour never observed either of the buildings that were damaged. He based *510 his conclusion that the buildings were hit by cyclonic winds on the type of damage they received as described by newspaper accounts. According to him, the walls of the buildings were blown out and not in, and therefore, the damage was the result of a cyclonic circulation. Only the newspaper article which described the damage to the St. Louis building was placed in evidence. The upper portion of the east wall of that building was destroyed. That portion of the building was vacant. There is no description of the direction in which the wall fell, but some rubble is evident at the base of the wall. The fact that the wind was blowing toward the southeast would seem to account for the direction of the fall of the rubble just as well as the conclusion that the damage was caused by a cyclonic wind. Although Umpenhour concluded the destruction of the building in St. Charles was also caused by a cyclonic wind, there were no reports of any funnels in the City of St. Charles.
At the riverfront one witness reported that the riverboat GOLDENROD, which was located 75 to 100 feet north of the BECKY THATCHER, was being pressed to the shore by a wind coming from the northeast, while the BECKY THATCHER was being hit by a wind blowing from the northwest. Another witness stated that an awning on the GOLDENROD was being blown toward the west. The witness Umpenhour concluded that this variation in wind direction was caused by a cyclonic wind. But, he also testified that, because of a 55-foot high concrete wall that was located to the northwest of the GOLDENROD, there would be a low pressure fall at the base of the concrete wall and the wind would skim toward the GOLDENROD at a higher level because of the wall's protective effect. If this is true it would seem that with a straight wind coming from the northwest the concrete wall could account for a difference in wind action upon the GOLDENROD and the BECKY THATCHER. Plaintiff's weather expert, John Ebert, testified that an interruption to the flow of air causes eddies and rather unpredictable things.
Umpenhour used weather data to conclude that there was the potential for a cyclonic wind at the riverfront. He then used reports of the wind condition on the waterfront to conclude that a straight wind that was already 100 miles per hour changed into a cyclonic wind in excess of 100 miles per hour immediately prior to hitting the BECKY THATCHER. The intense wind lasted for about thirty minutes. According to Umpenhour, a cyclonic wind would have had a greater velocity than the straight wind. Finally, both weather experts testified that they would expect a great deal of damage to the wooden superstructure of a boat if it were hit by a wind of 100 miles per hour. The only substantial damage to the superstructure of the BECKY THATCHER was caused by the pipebridge falling on the paddlewheel area after the collision.
The witness Ebert testified that the maximum wind gust at Lambert Field was 60 miles per hour and he would not expect more than a ten-mile per hour gust variation between the airport and the riverfront. A number of the witnesses who experienced the storm described it as the worst storm they had ever seen, and several of these witnesses were river pilots who had worked on the St. Louis riverfront for many years. According to the local climatological data for St. Louis (Ex. 31) there were at least four different occasions in 1969 alone when the fastest steady wind speed was higher than on June 28th.
The witness Umpenhour calculated the potential straight air speed as being 100 miles per hour from energy maps based on data collected at 7:00 p. m. and on a temperature of 93 degrees, when the actual temperature at 10:00 p. m. was 75 degrees, which decreases the likelihood of the validity of the calculation.
When we consider in conjunction with the testimony of the expert witness Umpenhour the facts that when the BECKY *511 THATCHER broke away, several witnesses were out in the storm; that no one who testified saw a waterspout or funnel at the riverfront before or during the storm; that there was no testimony by any witness who was out in the storm or on board the BECKY THATCHER that there was a definite lull followed by a great increase in intensity of the wind; that the intense wind lasted for some thirty minutes; that there was no substantial variation in the speed of the wind once the strongest winds hit the riverfront; and that the substantial damage to the superstructure of the BECKY THATCHER was not caused by the wind but by the pipebridge falling on it; the Court concludes that the wind on the riverfront was not cyclonic and the speed did not reach 100 miles per hour.
The wind speeds that can be expected in the St. Louis area were calculated by the witness Ebert. He used a standard formula to derive the wind expectancies over a 100-year period. Such calculations are used by architects to enable them to design buildings that will withstand the normal wind expectancies. In making the calculation, Ebert used the average highest wind gust per year over a twenty-year period and several other factors, and arrived at the conclusion that St. Louis should expect an 81-mile per hour wind gust once in every five years, a 97-mile per hour wind gust once in every twenty years, a 105-mile per hour wind gust once every forty years, and a 116-mile per hour wind gust once every one hundred years. This calculation correlates with the actual maximum wind gusts in the St. Louis area. In the five years previous to 1969 the maximum wind gust calculated from the maximum average windspeed was 78 miles per hour. The highest in the past one hundred years occurred in 1896, when the calculated wind gusts were 118 miles per hour. The record establishes that the winds of June 28, 1969, were not catastrophic, but rather were a foreseeable weather condition. While the storm was severe, this was to be expected at the St. Louis riverfront from time to time.
The BECKY THATCHER opened in February, 1969, and the mooring was completed a month or two prior to the opening. The mooring plan was designed by Captain William Koch. Pierson, President of Port of St. Louis, testified that other persons on the harbor were consulted, but no testimony was ever given as to who these persons were or what contribution they made, if any, to the mooring plan. Captain Koch gave Pierson a sketch which was similar to the pattern Captain Koch used to tie up his own fleet. Captain Koch had previous experience with mooring vessels but most of his experience had been with vessels smaller than the BECKY THATCHER, and most of the mooring was for a temporary duration. Captain Koch furnished his advice on an informal, unpaid basis from time to time as requested by Pierson. Pierson had never previously designed a mooring plan. Pierson testified that the mooring plan was reviewed by Balk and Associates, but he had never requested a professional engineer's opinion of the plan from Balk and Associates, and no one from that organization was ever called as a witness to testify as to the adequacy of the plan.
A sketch drawn after the casualty (Port of St. Louis Ex. A) is an approximation of the mooring arrangement that was in existence at the time of the casualty. The sketch shows that the equipment used to moor the fleet to shore consisted of nine winches attached to the mooring barge with wire ropes (also referred to as wires or cables), ranging in size from five-eighths of an inch to one and one-eighth inches in diameter, leading from the various winches to shore.
Most of the wire ropes used to moor the flotilla were new at the time they were placed in the mooring arrangement, but some were used. Some of the old wire was used elevator cable which had a fiber core. Even new cable with a fiber core is not as strong as solid wire rope. None of the winches were new *512 when they were installed. Pierson relied on the advice of others as to the adequacy of the wires and cables and as to whether the wires were the proper sizes for the drums of the winches. No one who testified had any knowledge of the actual capacity of any of the wires or winches.
The BECKY THATCHER was tied to the mooring barge by wire ropes laced between cavils.
Clark Parks, President of Parks Engineering and Construction Company, and a Captain Joseph Sherlock, initially tied the SANTA MARIA to the BECKY THATCHER. The lines used were manila and were two to two and one-fourth inches in diameter. Manila lines give a little and from time to time the lines had to be pulled tighter. The lines were tight on the morning of June 28th. No additions were made to the mooring apparatus holding the whole flotilla to shore in preparation for the mooring of the SANTA MARIA to the BECKY THATCHER, nor were any additions made afterward. Although Captain Sherlock testified that he was assigned to take care of the moorings of the SANTA MARIA, he also testified that he never inspected the wires mooring the flotilla other than by looking at them as he passed by. There is no evidence that any employee of Santa Maria Corporation attempted to determine the adequacy of the moorings of the flotilla or attempted to determine what effect the addition of the SANTA MARIA would have upon the safety of the moorings of the flotilla.
At the time of the breakaway the mooring wires had surface rust on them, although this rust had not pitted the wires. Some of the wires lay on the cobblestone part of the levee and were driven over regularly by automobiles. At least one wire was shiny where it had rubbed on the cobblestones as tires passed over it.
The mooring lines and winches were visually inspected on February 1, 1969, and once a week thereafter. The last inspection was five days previous to the accident. On the day of the breakaway the adjustment of the lines had been checked frequently up until 9:00 p. m., one hour before the breakaway. Donald Summer, who was in charge of adjusting the moorings of the flotilla, testified that when the wind changed it was necessary to adjust the mooring lines in order to control the tension or slackness of the lines and to keep the boat from moving around. Summer was out of town on June 28th and he had requested a Robert Koch to look after the lines in his place. Koch was manager of the restaurant facility of the BECKY THATCHER, but had previous experience with river vessels and their moorings. After checking the tautness of the mooring lines at 9:00 p. m. he was attending to his duties in the restaurant until the flotilla broke away.
Arthur Sargent, a naval architect from New Orleans, was called as an expert witness for plaintiff, while Santa Maria Corporation called Harry Reineke, also a naval architect from New Orleans. Both testified as to the adequacy of the moorings, and as to the effect of the SANTA MARIA on those moorings on the night of June 28th. Sargent used a calculation devised by the American Bureau of Shipping to calculate the size and strength of a mooring system adequate to secure the flotilla under the conditions present on June 28th. The calculation took into account the forces created by the wind, waves and inertia of the vessels. Sargent determined that if the BECKY THATCHER had been allowed to float freely so that it could line up with the wind a wire rope one and one-fourths inches in diameter would have been sufficient in a 60-mile per hour wind. Since the BECKY THATCHER could not line up with the wind, but could be hit broadside by it, Sargent calculated that a two or two and one-fourth inch wire rope would be necessary. The winch needed to accommodate a two-inch wire rope would require a shock load capacity of 300,000 pounds. Such a winch would be so large as to be *513 impractical and, therefore, vessels use chain rather than wire rope.
Reineke used calculations taken from a publication of the Society of Naval Architects and from a paper published by the S. O. Research and Development Corporation to determine the forces caused by the waves, wind and current on June 28th. For the purposes of the calculation Reineke assumed a wind velocity of 60 miles per hour hitting the BECKY THATCHER at a 45 degree angle. Using these figures, the calculated total forces on the mooring barge were 4,714 pounds, on the BECKY THATCHER were 44,200 pounds, and on the SANTA MARIA were 645 pounds. Reineke testified that the breaking strength of a seven-eighths inch wire rope would be approximately 60,000 pounds, which is greater than the total forces he calculated.
The large discrepancy between the results of the calculations of the two witnesses may be accounted for in part because of the inclusion of inertial forces in the calculation of Sargent and the exclusion of these forces in the calculation of Reineke. Inertial forces develop when there is acceleration by an object and the amount of inertial forces is dependent upon both the mass of the object and the rate of acceleration of the object. If there was no movement by the flotilla there would have been no inertial forces, but if there was movement inertial forces would have developed and would have placed stress on the mooring lines.
Although Port of St. Louis presented a witness who calculated the adequacy of the moorings, it contended that adequacy should not be determined by formula calculations which can never be precise but, rather, should be determined by the experience and judgment of people who are experienced mariners in the field. Some witnesses who had professional river experience testified that the moorings were adequate, though some of them, however, qualified these opinions. One stated that when he pronounced the moorings adequate he was thinking in terms of a normal wind. Another stated the moorings would be adequate for a 75-mile an hour wind, and a third stated that it would be adequate for a 60-mile per hour wind if the wind were not gusting. A Captain Frank Soucher, though testifying that the BECKY THATCHER was tied up all right, stated that his employer, Streckfus Lines, an operator of riverboats in St. Louis Harbor, used chains on all of its barges. Chains are a safer type of mooring.
Sargent testified that, if a storm is approaching, good marine practice would dictate a doubling of lines. However, the moorings of the BECKY THATCHER were designed as a permanent installation. As a permanent installation they should have been, and purportedly were, designed to withstand all foreseeable weather conditions. If they were adequately designed for that purpose a doubling of the mooring lines in the event of storm warnings would not be necessary.
The effect of the SANTA MARIA upon the moorings was disputed by the witnesses Sargent and Reineke. Once again, their difference of opinion was caused by the question of whether inertial forces were a significant factor. Reineke did not consider inertial forces in his calculation and came to the conclusion that, because the SANTA MARIA was sheltered from the wind by the BECKY THATCHER, she would account for only 1.2 percent of the total forces acting upon the moorings. Sargent could not calculate what percentage the inertial forces contributed to the total forces acting upon the moorings, but stated that the SANTA MARIA would contribute about one-eighth of the inertial forces. That there were inertial forces contributed by the SANTA MARIA is evident. Witnesses who observed the SANTA MARIA immediately prior to the breakaway testified that she was rocking back and forth and bobbing in the water. There was disputed testimony as to whether the SANTA MARIA was also striking the BECKY THATCHER. Two witnesses testified that she *514 was striking the BECKER THATCHER, and one of these witnesses testified that this caused the BECKY THATCHER to shudder. In any event, the movement of the SANTA MARIA would result in inertial forces that would be transmitted to the mooring lines. These forces caused by the independent movement of the SANTA MARIA would be in addition to the inertial forces resulting from her movements in unison with the BECKY THATCHER. The SANTA MARIA's movements in unison with the BECKY THATCHER would occur when the gusting wind would cause the mooring lines to sag and then go rigid again as it struck the flotilla at different intensities.
On the record before the Court it is impossible to determine whether the breakaway of the flotilla would have occurred if the SANTA MARIA had not been moored to the BECKY THATCHER. The exact velocity of the wind is not ascertainable. Further, since much of the mooring equipment was used and its strength never tested, the forces the moorings were capable of withstanding cannot be determined. Finally, the contribution of the SANTA MARIA to the forces acting against the mooring is incapable of being exactly calculated. With the absence of this information the only conclusion that can be reached with certainty is that the moorings were incapable of securing both vessels.
The only explanation Port of St. Louis offered as to the cause of the breakaway was that it resulted from weather conditions which could not have been reasonably foreseen or guarded against by the ordinary exertions of human skill or prudence. Since the Court is convinced that the wind velocity on June 28, 1969, was within the limits of the wind expectancies for the St. Louis area and was, therefore, foreseeable, the conclusion that the mooring was inadequate to withstand the foreseeable wind expectancies is inescapable.
The inadequacy of the moorings was the result of the use of inadequate mooring equipmentequipment that was inadequate both as to the quality of equipment and as to the type of equipment used. The quality and capacity of the mooring equipment was unknown, even to their purchaser, Frank Pierson. According to his testimony, Pierson relied on several unnamed persons to assure himself that the equipment was adequate. All of the winches and some of the wire ropes were used. No witness was called who could testify as to the condition, size and rated capacities of the winches at the time of installation. Pierson did not even know the age of the winches. Furthermore, in addition to using equipment of unknown quality, Port of St. Louis, unlike some other riverboats moored on the levee, used wire ropes, part of which were used, instead of chains. Chains are stronger than wire ropes and, according to the testimony of Sargent, the presence of only one large chain would have prevented the flotilla from breaking completely away from the levee and floating downstream.
At approximately 10:00 p. m. on June 28, 1969, the wire ropes and winches holding the mooring barge to the shore broke, and the whole flotilla swung around and headed downstream. There is no evidence in the record as to which winches or cables broke first. Cables numbered on Port of St. Louis' Exhibit A as 1, 2, 5, 6 and 8 broke, and winches numbered 3, 4, 7 and 9 broke. The flotilla drifted downstream toward the Illinois shore. It missed the piers of the Poplar Street Bridge and MacArthur Bridge, but hit some mooring piers immediately above the Cahokia power plant. The SANTA MARIA took the brunt of the impact and was crushed. The current then pulled the flotilla away from shore. Shortly before the flotilla reached the Monsanto dock, the SANTA MARIA broke loose from the flotilla. The flotilla, absent the SANTA MARIA, continued downstream and the BECKY THATCHER struck the Monsanto terminal facility. The SANTA MARIA was later found approximately 1,000 yards downstream from the Monsanto terminal.
*515 The eastern A-frame of the terminal facility was virtually destroyed and two sections of the pipebridge (the section leading from the shore and the middle section) collapsed and fell 12 to 15 feet, coming to rest on the strut of the paddlewheel of the BECKY THATCHER. The pipelines began dripping and there was a volatile odor in the area. The Rescue Coordination Center, located in downtown St. Louis, recommended that the BECKY THATCHER not be moved until daylight but Chief William Schott, a Coast Guard officer present at the scene, told Pierson that his own opinion was that he would remove the BECKY THATCHER to prevent further damage to the BECKY THATCHER. Pierson requested the aid of the tugboats, the ERNA A. and the KATHERINE L., and they removed the BECKY THATCHER at approximately 4:00 a. m. The removal resulted in the pipeline dropping even further and causing additional damages.
The parties have agreed that $409,972.63 is the amount of damages to the terminal properly allocated to the collision of the BECKY THATCHER with the Monsanto terminal. The parties further agreed that the sum of $30,000.00 was the amount of damages attributable to the removal of the BECKY THATCHER from Monsanto's pipebridge. Of this $30,000.00 plaintiff has recovered $20,000.00, leaving $10,000.00 presently in controversy in this regard.
Although Santa Maria Corporation and Port of St. Louis dispute the method by which the damages to the SANTA MARIA should be calculated, there is no dispute as to the facts from which their calculations were made. The SANTA MARIA was first displayed as a tourist attraction at the World's Fair in New York. Thereafter, she was moved to Washington, D. C. and used as a tourist attraction. The business did not do well and eventually the SANTA MARIA was sold at a U. S. Marshal's auction in Washington, D. C. Lawrence Rockefeller, who planned to use the SANTA MARIA in a museum complex in Puerto Rico or the Virgin Islands, was an active bidder, but the 1960 Investment Corporation, a St. Louis group, bid $375,000.00, and for this amount purchased the vessel and all of its artifacts in January, 1969. The Santa Maria Corporation was organized for the purpose of acquiring and operating the SANTA MARIA, and purchased her from the 1960 Investment Corporation for $375,000.00 in February, 1969. The cost of ship transportation and improvements amounted to $41,515.73. The depreciation as of December 31, 1969, was $14,169.00. After the collision, the Santa Maria Corporation incurred salvage expenses of $56,458.02.
A representative of the underwriters of the hull insurance of the SANTA MARIA drew up specifications for the repairs necessary to restore the SANTA MARIA to its original condition. These specifications were sent to eleven companies. Only one company, Parks Engineering Company, bid on repair work. The amount of the bid was $136,258.00. Wayne Millsap, Secretary of Santa Maria Corporation, testified that the bid was refused because it was felt the company did not have the necessary experience or special competence required, and that the representative of the underwriters concurred in this decision. Thereafter, invitations to bid on the purchase of the damaged hull were sent out, but no bids were received in response to that invitation to bid. Finally, on February 5, 1970, the SANTA MARIA, in its damaged condition, was sold to Sam Fox. Consideration for the sale was one dollar ($1.00), plus ten percent of the gross revenues from the operation of the SANTA MARIA. Fox Industries repaired the SANTA MARIA for $266,218.00, but in doing the repair did not use materials and techniques of the Fifteenth Century, the manner in which it had been originally constructed, because of the impracticality and the expense, nor was the SANTA MARIA reconstructed so as to make it seaworthy.
Fox estimated that on July 3, 1971, the end of the first full fiscal year of *516 his operation of the SANTA MARIA, the gross revenues would amount to approximately $100,000.00, and Santa Maria Corporation's share would be approximately $10,000.00. Robert Butler, an economic expert called by Santa Maria Corporation, testified that the value of the ten percent contract at the time of this trial was $48,700.00. Butler also testified that the value of the SANTA MARIA enterprise to Fox was $209,200.00.
Both plaintiff and Port of St. Louis agree that the burden of proof of exoneration from liability rests with Port of St. Louis. When a collision is caused by a vessel drifting from her moorings, "she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1866). The party asserting the defense of "inevitable accident" must affirmatively establish that the accident "`could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded'. * * * When a collision is caused by a vessel drifting from her moorings there is a presumption of fault on her part. * * *." Swenson v. The Argonaut, 204 F.2d 636, 640 (3rd Cir. 1953).
The facts show that Port of St. Louis has failed to make out a case of inevitable accident and to establish that the breakaway of the flotilla was without its fault. The record, instead, contains affirmative evidence that the weather conditions on the night of the casualty were forseeable and that the casualty was the result of the failure of Port of St. Louis to use adequate mooring equipment.
Plaintiff contends that the presumption that a moving vessel is at fault when she hits a stationary object is applicable to the SANTA MARIA since she was a part of the flotilla that broke away from the levee. The Santa Maria Corporation contends that this presumption does not apply since the SANTA MARIA did not strike the dock.
Neither party has cited any cases and the Court found none in which this question has been determined in a similar fact situation. In several cases the presumption has been extended to include vessels that did not strike a stationary object. Patterson Oil Terminals, Inc. v. The Port Covington, 109 F. Supp. 953 (E.D.Pa.1952), aff'd 205 F.2d 694 (3 Cir.); The Edward A. Uhrig, 9 F.2d 185 (W.D.N.Y.1925); Rawls Brothers Contractors, Inc. v. United States, 251 F.Supp. 47 (M.D.Fla.1966).
These cases involved ships which hit stationary objects while they were assisted by tugs. In these cases the presumption of fault was held to be applicable to the tugs as well as the ship. "The presumption of negligence arising from a vessel's collision with a stationary object operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision." Patterson Oil Terminals, supra, 109 F. Supp. at 955.
Judge Learned Hand discussed the rationale for the presumption of fault in Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 33 F.2d 272, 274 (2nd Cir.), cert. denied New York Marine Co. v. Cranberry Creek Coal Co., 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643 (1929), and stated:
"* * * [T]here are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the owner's knowledge, or, as in the case of collisions with an anchored vessel, because usually there must be some fault, it is thought just to require the owner to explain, and if he does not, to charge him. * * * [T]he owner's duty is often spoken of as the defense of `inevitable accident.' Strictly, it is no *517 defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which costs him if he fails.
"This duty extends not only to disclosing what happened, but * * * what would have been necessary to prevent it."
In applying this rationale to a situation in which a flotilla consisting of several vessels breaks its moorings, this Court concludes that the presumption should apply to all of those vessels in the flotilla. The facts as to the fault are especially within the knowledge of the owners of the vessels constituting the flotilla. The utility and justice of the presumption should not be abrogated simply because of the fortuitous circumstances that a particular vessel in the flotilla happened to be the one that was involved in the collision.
Plaintiff further contends that both defendants were in violation of a city ordinance and that, because of this, the burden of proof established in The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), should be applied. Since neither defendant was able to meet a lesser standard of proof, the determination of this issue is unnecessary.
The BECKY THATCHER was not moored on the river for the purpose of being a wharf boat. It was primarily a restaurant facility. The SANTA MARIA did not moor to the BECKY THATCHER at the suggestion of the owners of the BECKY THATCHER. Persons representing Santa Maria Corporation, the Mayor's office, and the Street Department, all requested that the SANTA MARIA be allowed to moor to the BECKY THATCHER before permission was given. There is no evidence that there was any reason for the SANTA MARIA to assume that the mooring lines of the BECKY THATCHER would be adequate if they had to support an additional 110-ton ship. The expert witness Reineke, called by Santa Maria Corporation to testify as to the adequacy of the moorings, testified that it would have been a good idea to find out what additional strains and forces the addition of the SANTA MARIA was going to cause to the mooring lines before it was so moored. This was not done and no inspection of the mooring lines was ever made by Santa Maria Corporation. Considering the circumstances under which the mooring occurred, these omissions constituted negligence on the part of Santa Maria Corporation.
Santa Maria Corporation contends that it had no responsibility for inspecting the mooring lines when it tied up to the BECKY THATCHER because a bailment relationship existed between Port of St. Louis and Santa Maria Corporation, which obligated Port of St. Louis to exercise ordinary care to keep the BECKY THATCHER and SANTA MARIA securely moored. No bailment relationship was ever created. The delivery necessary to constitute bailment was never made. According to the agreement between Santa Maria Corporation and Port of St. Louis, the only thing Port of St. Louis was required to do was to allow the SANTA MARIA to tie up to the BECKY THATCHER and to provide access over the BECKY THATCHER to visitors, employees or officers of the Santa Maria Corporation. The fact that Port of St. Louis may have had a duty to provide a safe berth for the SANTA MARIA does not mean that Santa Maria Corporation was not also required to use ordinary care. The Supreme Court long ago pointed out in Smith v. Burnett, 173 U.S. 430, 433-434, 19 S.Ct. 442, 43 L.Ed. 756 (1897) that when a vessel is moored both parties must exercise care. The Court held:
"Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths. At the same time the master is bound to use ordinary care, *518 and cannot carelessly run into danger. (Citing cases.)
* * * * * *
"And as to the degree of care required of the master or vessel owner, the same court in Nickerson v. Tirrell [, 127 Mass. 236] rightly said: `The true rule was stated to the jury, that the master was bound to use ordinary care, and could not carelessly run into danger. We cannot say, as matter of law, that he was negligent because he did not examine or measure the dock and berth. It was for the jury to determine whether the conduct and conversation of the defendant excused the master from making any more particular examination than he did make, and whether, upon all the evidence, he used such care as men of ordinary prudence would use under the same circumstances.'"
Although the fact situation in Smith v. Burnett, supra, was not the same as that in the present case and the decision did not deal with the question of liability to third parties, it is evident that both the party who provides a place to moor vessels and the party who moors a vessel has a duty to refrain from negligence. Under the circumstances present in this case, both Port of St. Louis and Santa Maria Corporation were negligent. The negligence of both defendants resulted in the breakaway of the flotilla and their concurrent negligence was the direct cause of the damage plaintiff incurred. Both parties are, therefore, liable to plaintiff.
Port of St. Louis contends that the damage to plaintiff's pipebridge, which resulted when the BECKY THATCHER was removed, was not a direct or proximate result of the negligence which caused the initial damage, but, rather, was the result of the intervening separate, independent and subsequent removal operation. The BECKY THATCHER was moved on orders of Port of St. Louis and there were some who recommended against it at that time as it would immediately cause additional damages to the pipebridge. Some of the damages were occasioned by the removal of the BECKY THATCHER on the night of the accident and both Port of St. Louis and Santa Maria Corporation are liable for damages occasioned by the removal of the BECKY THATCHER. The damages were the proximate result of the defendants' initial negligence. Villaneuva Compania Naviera, S.A. v. S. S. Matilde Corrado, 211 F.Supp. 930 (E.D.Va.1962).
Santa Maria Corporation pleaded as an affirmative defense statutes limiting vessel owner's liability, 46 U.S.C. §§ 183(a), 186 and 188. The pertinent section is § 183(a), which reads:
"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."
(Section 183(b) relates to seagoing vessels and is not pertinent here.)
Santa Maria Corporation stated in its brief that it retained Captain Joseph Sherlock, Jr., to be in charge of the mooring of the SANTA MARIA to the BECKY THATCHER and was entitled to rely on his competence. Therefore, Santa Maria Corporation contends that if Captain Sherlock were negligent in not determining the adequacy of the moorings holding the flotilla to shore, such negligence was not within the privity and knowledge of its corporate officers and, therefore, Santa Maria Corporation is entitled to the benefit of Section 183(a).
The burden of proof of establishing the lack of privity or knowledge *519 is upon those who seek the benefit of Section 183. Coryall v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).
Judge Friendly thoroughly considered the question of privity and knowledge as it applied to the mooring of a corporate-owned vessel in Petition of Kinsman Transit Company, 338 F.2d 708 (2nd Cir.), cert. denied Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1964). In that case, the corporation (Kinsman) that owned the vessel (SHIRAS) which broke from her mooring was located in Cleveland. The president of the company sent a qualified person to Buffalo to supervise the mooring of the SHIRAS. The court found that the officers of the corporation were not negligent in assigning the task to the person they chose and concluded that, under the previous decisions, the person the officers sent was not sufficiently high in the hierarchy of the management of the corporate owner to impute his knowledge to the corporation. However, the court limited its decision by stating at page 715:
"Still it seems likely that if Kinsman's headquarters had been in Buffalo, limitation would be denied under Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), on the basis that it was negligent not to check the adequacy of the mooring of the Shiras when dangerous conditions threatened on January 21, or even that it was negligent to fail to make a cautionary inspection of the moorings of Kinsman's vessels in the harbor at an earlier date."
The case of Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L. Ed. 903, involved a situation in which the corporation's executive officers had instructed Stover, the manager of the plant which used the ferry, the LINSEED KING, that the ferry should never be run through ice and that as soon as ice appeared in the river the ferry should be laid up for the winter. Stover had given an admittedly competent master of the ferry definite instructions never to run when there was ice in the river. The Supreme Court found that Stover was negligent when the master disobeyed these instructions, and as a result the ferry sank, killing many passengers. At page 510, 52 S.Ct. at page 452, the Court said:
"In view of the weather conditions and the observation of ice in the river some days prior to the accident by several witnesses, amongst them one of Stover's own subordinates, he should not have rested upon the mere instruction to the master not to run through ice. Before allowing the ferriage operation he was under obligation to assure himself by inquiries or by personal inspection that the Linseed King should not incur the hazard of colliding, as she did, with ice floes in the river."
Thus, a corporation cannot, in all instances, delegate authority to one whose privity and knowledge cannot be imputed to the corporation and be held to be without privity or knowledge.
"The factual possibility of control leads to a duty to exercise the control at a `sufficiently high' level to bind the corporation, and the failure to do so will in itself be `privity or knowledge', so that the owner loses the benefit of the Limitation Act whether the president or office boy was left in charge." Gilmore & Black, Admiralty 704 (1957).
In the present case there is no indication that Captain Sherlock was ever instructed to inspect the moorings of the flotilla to determine if the moorings were adequate to withstand the extra stresses the SANTA MARIA would place on them. But even if Captain Sherlock had been specifically ordered to inspect the moorings and make a determination as to their adequacy, this Court interprets the holding in the Spencer Kellogg case, supra, as requiring that the Santa Maria Corporation at least assure itself that an inspection was made. The failure to do so was the negligence of the officers of the corporation *520 and was, therefore, within the corporation's privity and knowledge.
The negligence which has been referred to and which resulted in the damage to plaintiff also is determinative of the allegations in the crossclaim of Santa Maria Corporation and Port of St. Louis that the damages resulting from the breakaway were the direct and proximate result of negligence by the other defendant. The damages to plaintiff and to the SANTA MARIA were the direct and proximate result of the negligence of both Port of St. Louis and Santa Maria Corporation.
The crossclaim of Port of St. Louis alleged that Santa Maria Corporation entered into a contract whereby it agreed to indemnify Port of St. Louis for any and all claims such as were here asserted. Port of St. Louis contends that because of this contract it is entitled to be reimbursed for all the fees, costs and expenses attendant to its defense of this suit and for any judgment against it.
The contract was executed in the City of St. Louis, State of Missouri, and consequently Missouri law applies. Govero v. Standard Oil Co., 192 F.2d 962 (8th Cir. 1951). Under Missouri law parties may expressly contract to indemnify the indemnitee from a loss sustained as the result of his own negligence, but in Missouri District Telegraph Co. v. Southwestern Bell Telephone Co., 338 Mo. 692, 93 S.W.2d 19, 28 (1935), the Missouri Supreme Court stated:
"It is well settled that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms."
The need for such "unequivocal terms" in the indemnity contract is well illustrated by that particular case. The court found the telephone company and the telegraph company to be concurrently negligent in failing to inspect and discover the dangerous condition of a telephone pole crossarm which caused the injury of the employee of the telegraph company. The telegraph company was maintaining its plant facilities under a lease from the telephone company. The lease contained a provision by which the telegraph company undertook to indemnify the telephone company "from and against any and all * * * claims, suits, judgments for damages, or injuries arising to persons or property or in any manner by reason of the use or maintenance by the lessee of plant facilities hereunder, * * *." The Missouri Supreme Court determined that this clause did not say plainly or otherwise that the telegraph company should indemnify the telephone company for the consequences of its own wrongs. The telephone company could not escape the liability that resulted from its negligence by relying on the indemnity clause. Thomas v. Skelly Oil Company, 344 S.W.2d 320 (Mo.App.1960) is a more recent case that is equally stringent in requiring unequivocable terms in an indemnity contract before a party can be indemnified for liability resulting from its own negligence.
The indemnity clause in the contract between Port of St. Louis and Santa Maria Corporation states:
"First Party (Santa Maria Corporation) agrees to indemnify and hold harmless Second Party (Port of St. Louis) against any loss, including costs and fees on account of any action brought against Second Party for injury or damages from any cause whatsoever arising out of and as a result of tying up and the providing of access over its decks and passageways."
Under the Missouri authority cited above it is evident that the words of the indemnity clause do not express the intention to indemnify Port of St. Louis for loss resulting to it through its own negligence in terms that can be characterized as unequivocable. The counterclaim of Port of St. Louis will, therefore, be denied.
It was agreed by the parties that the damages of plaintiff applicable to the case amounted to $419,972.63. The divided *521 damages rule for mutual fault is stated in Empire Seafoods, Inc. v. Anderson, 398 F.2d 204, 217, cert. denied 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (5th Cir.1968):
"* * * [T]he divided damages rule for mutual fault applies. The rule is well settled, as succinctly stated in Smith v. Nicholson Transit Co., W.D.N.Y., 1941, 39 F.Supp. 795, that,
"`Where, as here, two parties are responsible for injury to a third, each is primarily liable for one-half the damages. The respondent and the respondent-impleaded should each pay one-half the damages, and if any part of the damages assessed against one of the respondents cannot be collected from that respondent the balance may be assessed against the other respondent in addition to the one-half which that respondent is compelled to pay in the first instance. (Citing cases.)'"
Port of St. Louis contends it is not liable to Santa Maria Corporation for the damages to the SANTA MARIA because as between them this was not a collision case but, rather, a breakaway from moorings. Halcyon Lines v. Haenn, 342 U.S. 282, 72 S.Ct. 277, 96 L. Ed. 318 (1952) stated that the divided damages rule has never been applied to non-collision cases. When the flotilla hit some mooring piers above the Cahokia Power Plant, the SANTA MARIA, which was still tied to the BECKY THATCHER, took the brunt of the impact and was crushed. The Court cannot see why this fact situation should be characterized as anything but a collision case, and Port of St. Louis cites no authority to indicate why it should not. Therefore, the established rule of divided damages will be applied.
The general rule governing damages is stated in Pan-American Petroleum & Transport Co. v. United States, 27 F.2d 684, 685 (2nd Cir. 1928):
"Strictly the measure of damages in collision is the difference in value between the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent."
Evidence as to the value of the SANTA MARIA before and after the collision was presented, as well as evidence as to the cost of necessary repairs. The SANTA MARIA was purchased as a tourist attraction. Because of the large disparity between the cost of the SANTA MARIA and her value as a business enterprise, the Court is of the opinion that the cost of the necessary repairs is the best means of determining the damages to the SANTA MARIA.
The salvage expenses amounted to $56,458.02. A bid of $136,258.00 was received for the complete repair of the vessel in accordance with specifications sent out by Santa Maria Corporation. Although the directors of Santa Maria Corporation rejected this bid and the repairs that were later made cost $266,218.00, the original bid is determinative of the damages to Santa Maria Corporation. "Any award must be calculated with recognition of the customary obligation of the injured party to minimize damages." Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32 (2nd Cir. 1948). The loss of earnings need not be considered since the SANTA MARIA produced a net loss during the time that Santa Maria Corporation operated her. The damage to Santa Maria Corporation is $192,716.02, the sum of the salvage expenses and the cost of repair necessary to put the SANTA MARIA back in its original condition as a vessel.
Plaintiff has requested pretrial interest on its damages. The Court will allow plaintiff interest from the date of the collision, June 28, 1969. In Sinclair Refining Company v. S. S. Green Island, 426 F.2d 260, 262 (5th Cir. 1970), the court held:
"The general rule in admiralty is that those injured by tortious collision are entitled to interest as a part of just compensation for the wrong done, and discretion to deny interest is *522 based upon the existence of peculiar circumstances."
There are no circumstances present that persuade the Court that interest should be denied.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law and the clerk is directed to enter judgment in favor of plaintiff for $419,972.63, plus interest from June 28, 1969. The judgment shall provide that each defendant pay one-half of this amount, and further provide that any part of the one-half damages assessed against either defendant, which plaintiff may not be able to collect from that defendant, be assessed against the other defendant, in addition to the one-half which it is in the first instance compelled to pay. The clerk of the court is also directed to enter judgment in favor of Santa Maria Corporation on its crossclaim against Port of St. Louis for $96,358.01.
The clerk of the court is also directed to enter judgment in favor of Santa Maria Corporation on the crossclaim filed against it by the Port of St. Louis.